925 F.2d 83
 UNITED STATES of America, Appellant,
v.
Michael Jeffrey STOTTS, III, Plaintiff-Appellee,
Edwin Meese; Norman A. Carlson; Gary R. McCune; Sam
Samples; Lara Tuggle; Ronnie Alston, All sued in their
individual and official capacities; J. Michael Quinlan, In
his official capacity as Director of the Bureau of Prisons, Defendants,
and
North Carolina Civil Liberties Union Legal Foundation,
Amicus Curiae.
UNITED STATES of America, Appellant,
v.
Michael Jeffrey STOTTS, III, Plaintiff-Appellee,
Edwin Meese; Norman A. Carlson; Gary R. McCune; Sam
Samples; Lara Tuggle; Ronnie Alston, All sued in their
individual and official capacities; J. Michael Quinlan, In
his official capacity as Director of the Bureau of Prisons,
Defendants.
 Nos. 90-7012, 90-6859.
 United States Court of Appeals,
Fourth Circuit.
 Argued Oct. 31, 1990.
Decided Feb. 5, 1991.
 
 Eileen G. Coffey, Asst. U.S. Atty., argued (Margaret Person Currin, U.S. Atty., R.A. Renfer, Jr., Asst. U.S. Atty., on brief), Raleigh, N.C., for appellant.
 Marvin Ray Sparrow, North Carolina Prisoner Legal Services, Inc., Raleigh, N.C., for plaintiff-appellee.
 Jonathan A. Blumberg, Melissa H. Hill, Tharrington, Smith & Hargrove, Raleigh, N.C., for amicus curiae.
 Before ERVIN, Chief Judge, WILKINSON, Circuit Judge, and HOUCK, United States District Judge for the District of South Carolina, sitting by designation.
 WILKINSON, Circuit Judge:
 
 
 1
 This case involves a constitutional challenge to regulations promulgated by the United States Bureau of Prisons concerning the handling of incoming prisoner mail. The regulations at issue specify how incoming mail must be marked to qualify for confidential treatment as special or legal correspondence. The federal magistrate judge held that the regulations unconstitutionally obstructed prisoner Stotts' right of access to the courts and his freedom of expression. Because we believe that the Bureau of Prisons' regulations are "reasonably related to legitimate penological interests," Turner v. Safley, 482 U.S. 78, 89, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64 (1987), we now reverse.
 
 I.
 
 2
 Michael Stotts, a prisoner in custody of the United States Bureau of Prisons, filed a complaint on July 29, 1986 in the United States District Court for the Eastern District of North Carolina, alleging that prison officials at the Federal Correctional Institute at Butner, North Carolina were violating his constitutional rights. The sole claim that survived for trial was his request for injunctive relief against the Bureau of Prisons' (BOP) policies regarding incoming legal or special mail. Stotts charged that prison officials were violating rights guaranteed by the First, Fifth, and Sixth Amendments by opening and reading his confidential legal mail.
 
 
 3
 Federal regulations divide incoming prison mail into two categories: general and special. General mail is subject to being opened by prison officials, checked for contraband, read for plans to perform illegal acts, and then reclosed and delivered to the prisoner. 28 C.F.R. Sec. 540.14 (1990).[1] Special mail refers to certain written communications from attorneys, courts, congressmen and other public officials. It enjoys more protection than general mail in that it cannot be read by prison officials and can be opened to check for contraband only in the presence of the prisoner to whom it is addressed. Id. Sec. 540.18.
 
 
 4
 Correspondence qualifies as special mail only "if the sender is adequately identified on the envelope, and the front of the envelope is marked 'Special Mail--Open Only in the presence of the inmate.' " Id. Sec. 540.18(a). Mail from an attorney has to be marked not only with the "Special Mail" phrase, but also with the attorney's name and the fact the sender is an attorney. Id. Sec. 540.19(b). Officials at Butner, where Stotts was held, require that all special mail be delivered within twenty-four hours of its receipt. The date and time of receipt of special mail at the institution are entered in a log and the mail is then given to the inmate's unit manager, who signs a receipt. Each unit manager also maintains a separate log to record his receipt of the mail and the time of delivery to the inmate. Inmates sign receipts upon final delivery of the mail. See id. Sec. 540.19(a).
 
 
 5
 In 1988, the BOP issued an Operations Memorandum regarding handling of special mail. Although the regulations themselves remained unchanged, the BOP adopted three new procedures in implementing them: (1) mail from a judge's chambers or a congressional member was to be treated as special mail, even if not marked as such; (2) inmates were to be provided instruction sheets with which to inform their attorneys of how to comply with the special mail regulations; (3) mail from qualified senders besides judges and congressmen was to be treated as special mail if the sender was adequately identified on the envelope and if the correspondence was marked either with the complete "Special Mail" phrase or with similar language indicating that it qualified for special treatment and was to be opened only in the presence of the prisoner. The last provision was designed to discourage prison officials from declaring that only envelopes bearing "magic words" would qualify as special mail. Evidence showed that officials at Butner had been using such an approach in 1986 when Stotts filed his suit.
 
 
 6
 A trial was held before a federal magistrate judge in February 1989 pursuant to 28 U.S.C. Sec. 636(c). Stotts argued that the regulations as applied both in 1986 and under the 1988 procedures were unconstitutional. He pointed to the North Carolina prison system's special mail policy as "a ready, reasonable, feasible alternative" to the federal approach. The magistrate judge found that in North Carolina state prisons, any letter that appears from its return address to be from an attorney, law firm, or court is accorded special mail status. Holding that the regulations were not reasonably related to any legitimate penological interest, the magistrate judge declared them unconstitutional as applied to Stotts in 1986 and 1988. He then enjoined defendants from reading or opening outside of Stotts' presence any incoming mail addressed to Stotts and "bearing an apparently genuine return address of an attorney, a law firm, any court official or any government official, whether or not there are any particular markings on the envelope."
 
 
 7
 The BOP now appeals.
 
 II.
 
 8
 Under Turner v. Safley, 482 U.S. 78, 89, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64 (1987), a prison regulation "is valid if it is reasonably related to legitimate penological interests." The BOP maintains that its mail system is rationally related both to security and administrative interests. We agree that both the requirement that the legal sender be specifically identified and the requirement that confidential mail be marked as such serve legitimate state ends.
 
 A.
 
 9
 We recognize at the outset that prison inmates retain a number of constitutional rights, including the right to petition the government for redress of grievances, Johnson v. Avery, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969), the right of access to the courts, Younger v. Gilmore, 404 U.S. 15, 92 S.Ct. 250, 30 L.Ed.2d 142 (1971), the protection of due process, Wolff v. McDonnell, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), and freedom of expression. Turner v. Safley, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). The contours of these rights are, however, imprecise. In Wolff v. McDonnell, the Court rejected a state prisoner's claim that prison officials could not open mail from his attorney to check for contraband, noting that the constitutional status of the rights the inmate claimed under the First, Sixth and Fourteenth Amendments was "far from clear." 418 U.S. at 575, 94 S.Ct. at 2984. For example, the Fourteenth Amendment right of due process via access to the courts "has not been extended ... to apply further than protecting the ability of an inmate to prepare a petition or complaint." Id. at 576, 94 S.Ct. at 2984; Royse v. Superior Court of Washington, 779 F.2d 573, 575 (9th Cir.1986). Notwithstanding the vague parameters of the rights which Stotts asserts, we shall assume for purposes of this appeal that they are implicated by the regulations which he challenges.
 
 
 10
 Recognition of some measure of constitutional protection, however, "in no way implies that these rights are not subject to restrictions imposed by the nature of the regime to which [prisoners] have been lawfully committed." Wolff, 418 U.S. at 556, 94 S.Ct. at 2975. Maintaining safety and internal security are "core functions of prison administration," Turner, 482 U.S. at 92, 107 S.Ct. at 2263, that can justify "withdrawal or limitation of many privileges and rights...." Price v. Johnston, 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356 (1948). Other legitimate penological objectives that warrant limits on the exercise of inmate rights include rehabilitation of prisoners and deterrence of crime, O'Lone v. Estate of Shabazz, 482 U.S. 342, 348, 107 S.Ct. 2400, 2404, 96 L.Ed.2d 282 (1987), as well as the savings of scarce prison resources. Id. at 352-53, 107 S.Ct. at 2406-07; see Turner, 482 U.S. at 90, 107 S.Ct. at 2262.
 
 
 11
 It is important, in balancing these interests, that courts respect the determinations of prison officials. Thornburgh v. Abbott, 490 U.S. 401, 109 S.Ct. 1874, 1878-81, 104 L.Ed.2d 459 (1989). Under Turner, we focus simply on whether the regulations are reasonable. This is a deferential standard that is "necessary if 'prison administrators ..., and not the courts, [are] to make the difficult judgments concerning institutional operations.' " 482 U.S. at 89, 107 S.Ct. at 2261 (quoting Jones v. North Carolina Prisoners' Labor Union, Inc., 433 U.S. 119, 128, 97 S.Ct. 2532, 2539, 53 L.Ed.2d 629 (1977)). Under a standard of heightened judicial scrutiny, "every administrative judgment would be subject to the possibility that some court somewhere would conclude that it had a less restrictive way of solving the problem at hand." Id. Our approach, therefore, is one of caution; we are not "unnecessarily to perpetuate the involvement of the federal courts in affairs of prison administration." Procunier v. Martinez, 416 U.S. 396, 407, 94 S.Ct. 1800, 1808, 40 L.Ed.2d 224 (1974); see also Thornburgh, 109 S.Ct. at 1879-81.
 
 B.
 
 12
 Turner v. Safley established a four-part test for determining the constitutionality of prison regulations. Under the first part we must examine the prison regulations and the governmental interests justifying them to see whether they are reasonably related. 482 U.S. at 89-90, 107 S.Ct. at 2261-62. Stotts initially asserts that the prison rules regarding mail do not advance security interests. The only real difference between special and general mail, he maintains, is that prison officials do not read special mail; therefore, it is possible that plans for illegal acts such as escapes that are contained in special mail could pass to inmates unobserved. Stotts claims, however, that the challenged regulations do not decrease this possibility because anyone wishing to smuggle in escape plans could take extra precautions to comply with the regulations and could easily include an attorney's name in the return address and mark the letter with the "Special Mail" legend.
 
 
 13
 The prospect that a conspirator in an escape plan may inscribe a fictitious attorney name on readily available legal letterhead and thus "comply" with the regulations hardly renders them unreasonable, however. In fact, the regulations make fictional devices easier to disprove, and thus create a deterrent effect. Requiring the name of the specific person claiming an attorney-client privilege, for example, makes screening quicker and more accurate. In order to verify in advance of delivery that a given letter is genuine, a prison official need not call a law firm and try to ascertain which of many attorneys may be working on a case, but can simply and quickly speak with the named lawyer. Should a breach of security actually occur, the process of tracing senders subsequent to delivery would similarly be enhanced. Moreover, the Supreme Court has already stated that requiring attorneys to identify themselves to prison officials in advance and to specially mark their mail with their name and address in order to obtain special treatment is "entirely appropriate." Wolff, 418 U.S. at 576-77, 94 S.Ct. at 2984-85.
 
 
 14
 Stotts argues further that the regulations have no impact upon security concerns surrounding contraband because every letter, whether special or general, is opened and examined for materials such as money and drugs. This overlooks a critical point. Letters marked as special mail are opened in the prisoner's presence, so any contraband in the envelope would be within reach of the inmate. A prisoner's obvious temptation to attempt to obtain scarce contraband may place the officer opening the mail at risk. This risk increases with the volume of special mail, particularly as more letters that are not confidential legal mail are treated as such.
 
 
 15
 Contrary to the magistrate judge's reasoning, the BOP does not need actually to demonstrate that its regulations enhance deterrence or diminish security risks. The BOP can and should act in anticipation of prospective security concerns. See O'Lone, 482 U.S. at 349, 107 S.Ct. at 2404; Turner, 482 U.S. at 89, 107 S.Ct. at 2261-62. We will not require that an actual breach of security occur before upholding regulations designed to prevent it. The absence of documented security breaches at Butner associated with special mail is consistent with the government's deterrence theory. In sum, there is a clear rational relationship between the regulations and security interests.
 
 
 16
 Stotts argues additionally that the regulations do not advance any legitimate administrative interests. He recognizes that his desired mail system will result in an increased quantity of correspondence that is given special treatment. Yet he asserts that the only resulting administrative burden is that created by the BOP itself in requiring multiple records of receipts and deliveries every time special mail changes hands. The magistrate judge found that this recordkeeping system was developed to defend against prisoners' claims of mail processing delays rather than to promote security, and thereupon dismissed its legitimacy by characterizing it as "gratuitously provided."
 
 
 17
 That approach epitomizes the micromanagement of prisons that courts should not attempt. Prisons must work with very limited resources. If prison management has instituted a precise recordkeeping system to stave off the necessity of defending itself against prisoners' legal claims, we must assume that it has found the costs of recordkeeping to be less than the costs of defending itself. We are not in a position to second-guess that judgment as it is purely one of prison administration. Furthermore, the magistrate judge erred in ruling that the recordkeeping system was "not pursuant to any legitimate penological concern." Protecting the institution from lawsuits by documenting official actions could hardly be more appropriate, and preventing a drain of prison resources is clearly legitimate. O'Lone, 482 U.S. at 352-53, 107 S.Ct. at 2406-07. To hold otherwise would require that prison officials leave themselves vulnerable to inmate legal action or adopt slipshod mail delivery systems. It is particularly ironic that Stotts discounts as unnecessary a set of procedures that guarantees he will receive all special mail within twenty-four hours of its arrival at the prison.
 
 
 18
 The BOP has thus articulated how its regulations advance both security and administrative interests. The logical connection between these interests and the challenged regulations are hardly "so remote as to render the policy arbitrary or irrational." Turner, 482 U.S. at 89-90, 107 S.Ct. at 2262.
 
 
 19
 The second Turner inquiry is "whether there are alternative means of exercising the right that remain open to prison inmates." 482 U.S. at 90, 107 S.Ct. at 2262. Stotts argues that the mail is a prisoner's only link to lawyers, public officials, and courts. We agree that the mail is an important means of communication for prisoners but observe that it is hardly the only one. Prisoners can additionally communicate with their attorneys via the telephone and personal visits.
 
 
 20
 The main point, however, is that Stotts' right of access to the courts is hardly obstructed by requiring that confidential legal mail be appropriately marked. Under the BOP's regulations, prisoners receive every piece of their mail, whether it is special or general, whether it is opened in or outside of their presence, and whether or not it is read. Stotts makes no claim of censorship. Not a single piece of mail that Stotts sends out from the prison to his attorneys or to a court can be opened or read. 28 C.F.R. Sec. 540.18(c) (1990). Amicus North Carolina Civil Liberties Union maintains that prison officials may have an interest in litigation concerning prison conditions and may receive advance warning of litigation or become privy to trial strategies by reading confidential mail. This argument falls, however, on the fact that every confidential communication can easily and consistently be made secure from undue scrutiny. Some classes of mail, such as letters from a judge's chambers, are automatically accorded special mail status. Attorneys can guarantee the privacy of their communications simply by including their name and occupation in the return address and by affixing a legend to the envelope. The cost of compliance with the regulations is virtually nil. Attorneys could easily obtain a stamp or stickers with which to mark legal mail they send to prisons. Inmates can easily notify their lawyers of the regulations because the BOP provides prisoners with sheets of instructions to send their legal correspondents. It is difficult to see a burden of constitutional dimension when Stotts receives and reads all his incoming mail, is able to send freely his outgoing mail, can easily inform his attorneys of the proper procedures, and the costs of complying with the regulations are trivial.
 
 
 21
 The third consideration under Turner is "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." 482 U.S. at 90, 107 S.Ct. at 2262. Under Stotts' preferred delivery system, officials would look merely for the return address of an "apparently genuine" legal sender; attorneys would not have to identify themselves and envelopes would not have to bear any words requesting confidentiality or special treatment. Stotts concedes, as he must, that under this system the quantity of mail that is treated as special mail will increase. In addition, the difficulties and uncertainties of handling mail will be magnified, and the administrative costs and resources devoted to mail delivery may rise accordingly. The evidence below does not suffice to quantify the consequences of adopting Stotts' proposal, but the simple recognition of its deleterious effect serves to buttress the reasonableness of the BOP's current regulations.
 
 
 22
 The fourth and final factor is the presence or absence of any ready alternatives. Turner, 482 U.S. at 90, 107 S.Ct. at 2262. This inquiry is not intended to be a "least restrictive alternative" test in which prison officials must "set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint." Id. at 90-91, 107 S.Ct. at 2262. Rather, the existence of a ready alternative can be cited as evidence that the government's regulation is not reasonably related to a legitimate penological interest. Id. at 91, 107 S.Ct. at 2262. Here, Stotts points to the mail procedures used by the North Carolina prison system as showing that the BOP's regulations are unreasonable. According to a former superintendent of three North Carolina prisons, state officials would treat as legal mail any correspondence "that appeared to be from an attorney or court system."
 
 
 23
 It is not at all clear, however, that such an approach better protects prisoners' rights. Sorting officials possess a larger degree of discretion under such a system, with a correspondingly increased possibility of inconsistent treatment of similar letters. Guards may be unable to determine whether or not a communication is truly deserving of protection absent a notation designating it as confidential. An "apparently genuine" standard is a nebulous one that could easily give rise to prisoners' claims that they had been harmed when legal mail had been improperly or inconsistently handled. Thus, prison officials seem to face the choice of establishing an easily applicable bright-line rule and responding to complaints that the rule is too arbitrary and harsh, or of establishing a discretionary standard and responding to claims that such a standard is vague, arbitrary, and inconsistently applied.
 
 
 24
 We cannot fault the BOP for opting to implement the clearer rule. Any uniform rule will be unavoidably arbitrary to some extent, in that some specific number of communications that actually are special mail will fall outside the established category because they have been mismarked. Yet a consistent requirement that special mail be marked with a legend accomplishes two significant goals here. First, it provides mailroom workers a ready screening technique for handling the more than 156,000 pieces of mail a week that the federal prison system must process. Second, and more importantly, it provides a guarantee to prisoners and attorneys that if they comply with the regulations, their mail will receive special treatment. Parties need not trust to the discretion of whichever employee is sorting the mail on a given day to receive protection; they can ensure special treatment by properly marking their letters. In addition, a former North Carolina prison superintendent testified that state guards would quickly skim page by page through the legal mail once it was opened in order to verify that it was, in fact, legal mail. Officials at Butner, however, are prohibited from glancing at the contents of legal mail, even to determine whether it is actually legal mail. In that respect, the federal system may afford more privacy to special mail than does the described state system.[2]
 
 
 25
 Whether the procedures employed in the federal system or in the North Carolina prison system better protect the rights of prisoners is an open question. Inmates may actually prefer a bright-line rule to one that provides prison officials more discretion. The debate is certainly not so one-sided that Stotts can hold up an alternative approach as proof that the current federal regulations are unreasonably restrictive.
 
 III.
 
 26
 Both the requirement that a legal sender be specifically identified and the requirement that confidential mail be marked as such are "reasonably related to legitimate penological interests." 482 U.S. at 89, 107 S.Ct. at 2261.[3] They advance not only important security concerns, but administrative concerns as well. Stotts' asserted rights are minimally compromised, if at all, by the current application of the regulations; he receives all his mail and the privacy of his legal communications can be assured at virtually no cost. Alternative approaches to the federal regulations pose their own set of problems, and as courts unversed in prison administration, we are loathe in any case to choose among them. Finding no constitutional violation in the challenged BOP procedures for processing prisoner mail, we reverse the magistrate judge's judgment.
 
 
 27
 REVERSED.
 
 
 
 [1]
 All citations are to the 1990 Code of Federal Regulations. The relevant sections have not been amended since 1986
 
 
 [2]
 Obviously, the approach used in North Carolina prisons is not before us. In declining to require the BOP to adopt it, we in no way intend to impugn its constitutional validity
 
 
 [3]
 Although this analysis focuses on the current application of the regulations, it applies as well to the regulations as interpreted in 1986