**Len MARTUCCI, Plaintiff–Appellant,**

v.

**Avery JOHNSON, et al., Defendants– Appellees.**

No. 89–6574.

United States Court of Appeals, Sixth Circuit.

Argued May 2, 1991.

Decided Sept. 12, 1991.

Len Martucci, pro se.

Leah J. Prewitt, Knoxville, Tenn. (argued and briefed), for plaintiff-appellant.

Donald D. Howell, Knoxville, Tenn. (argued and briefed), for Avery Johnson, Rich Scarborough, Tom Van Riper, Anderson County (Tenn.), and John Does, Jane Does & Co-conspirators.

Charles W. Burson, Atty. Gen., Charles A. Daughtrey, Asst. Atty. Gen., Nashville, Tenn., for Curtis Sturgill.

Before KRUPANSKY and BOGGS, Circuit Judges, and COHN, District Judge.*

KRUPANSKY, Circuit Judge.

Plaintiff-appellant Len Martucci (Martucci) appealed the entry of summary judgment against him in this action commenced pursuant to 42 U.S.C. § 1983 alleging various constitutional violations by officials of the Anderson County, Tennessee, sheriff's department in concert with an agent of the Tennessee Bureau of Investigation (TBI).

Martucci is currently incarcerated in a Tennessee prison, where he is serving a term for first degree murder. When Mar-

* The Honorable Avern Cohn, United States District Judge for the Eastern District of Michigan, sitting by designation.

tucci was originally arrested on the murder charge in early 1988, he was committed to the pre-trial custody of the Anderson County jail, where he was detained until tried and convicted in December of that year. The instant controversy stems from Martucci's segregated confinement in that facility, for eight days between February 8 to 16, 1988, in a six by ten foot cell furnished only with a bed, sink, and toilet. During this period, Martucci was in the cell for 23 hours a day, with one hour allotted for exercise. His mail was withheld and he had no access to a telephone. On February 16, 1988, Martucci was returned to the general jail population.

At no time during his confinement was Martucci informed of the reasons for his segregation. It is not disputed that jail officials told him that he would be released once he "ceased causing problems." It was conceded by all parties that Martucci had been segregated in this matter because an agent of the TBI, Curtiss Sturgill (Sturgill), had reported to the Anderson County jailers that Martucci was planning an escape from the facility.

On February 13, 1989, several days short of the one year anniversary of his release from segregation, Martucci filed a pro se complaint with the district court in which he named the Anderson County jailers along with various anonymous persons as parties-defendant.[1] In his complaint, Martucci asserted three distinct constitutional claims arising out of the conditions of his confinement in the Anderson County jail. First, he alleged that he had been deprived of due process because he had not been afforded a hearing to challenge the asserted basis for his segregated confinement. Second, Martucci charged that his constitutional right of access to the courts had been abridged during the entire period of his pretrial detention because the jail facili-

ty contained no law library. Lastly, Martucci alleged that he had been denied access to his mail in violation of the first amendment.

In granting summary judgment in favor of the defendants, the district court concluded that because Martucci's segregation was for "administrative" and not "disciplinary" reasons, he had no due process right to a hearing to challenge the reasons for his separate confinement. In arriving at its decision, the district court cited the insufficiency of the evidence to rebut jailer Avery Johnson's affidavit, which attested that Martucci had been segregated solely for "security" reasons. The district court further concluded as a matter of fact that the actions of the jailers had not been arbitrary or capricious, because in segregating Martucci they were acting upon credible information from a reliable source indicating that the prisoner was planning to escape. The district court decided that Martucci had been placed in segregated confinement solely for "security" or administrative reasons, and consequently had not been disciplined for violating any prison rules or regulations.

This court's evaluation of the constitutionality of the jailers' conduct in this case must be conducted with due regard for their role as guardians of the institution's security. It is without question that "[p]rison officials must be free to take appropriate action to ensure the safety of inmates and corrections personnel and *to prevent escape* or unauthorized entry." *Bell v. Wolfish,* 441 U.S. 520, 547, 99 S.Ct. 1861, 1878, 60 L.Ed.2d 447 (1979) (emphasis added). Therefore, "[p]rison administrators ... should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order

---

**1.** At the time he commenced suit, Martucci was not aware of the identity of agent Sturgill. On June 15, 1989, several months beyond the expiration of the statute of limitations applicable to section 1983 actions in Tennessee, Martucci moved to amend the complaint to specifically name Sturgill as a defendant. The district court granted Sturgill's motion to dismiss the complaint against him as time-barred, reasoning

that the denomination of Sturgill as party-defendant could not "relate back" to the timely filing of the original complaint under Fed.R.Civ.P. 15(c). In light of the disposition reached herein, the question of whether the district court abused its discretion in so ruling is of no consequence to the instant appeal and is therefore not addressed.

and discipline and to maintain institutional security." *Id.* This deferential standard is necessary to ensure that "prison administrators ..., and not the courts, ... make the difficult decisions concerning institutional operations." *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64 (1987) (quoting *Jones v. North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. 119, 128, 97 S.Ct. 2532, 2539, 53 L.Ed.2d 629 (1977)).

■ With more specific relevance to the case at bar, it is important to note that "the 'essential objective of pretrial confinement is to insure the detainee's presence at trial.'" *Bell v. Wolfish,* 441 U.S. at 535, 99 S.Ct. at 1872. Prison officials have perhaps no more important obligation than to guard against the omnipresent threat of escape, the consequences of which are scarcely imaginable where the would be escapee had been accused or convicted of a violent crime. For this reason, a court sitting in judgment of an official's conduct must guard against the temptation to second-guess the jailers by "conclud[ing] that [they] had a less restrictive way of solving the problem at hand." *Turner v. Safley,* 482 U.S. at 89, 107 S.Ct. at 2262.

■ Because the conditions imposed on Martucci during the eight days of his segregated confinement were "reasonably related to [the] legitimate governmental objective" of aborting his escape and insuring his presence at trial, *see Bell v. Wolfish,* 441 U.S. at 535, 99 S.Ct. at 1872, segregation did not, under the circumstances, amount to unconstitutional "punishment." Because it did not amount to punishment, Martucci's placement in segregated confinement did not, in and of itself, violate principals of due process as applied in the context of pre-trial detention. *Id.*

■ Nor did the lack of a hearing at which Martucci could contest the reasons for his confinement constitute a violation of his rights to procedural due process. (Martucci's pro se complaint, which must be liberally construed,[2] can be interpreted to challenge both the *conditions* of his con-

finement under the due process clause and *Bell v. Wolfish,* as well as the *process* by which he was separated from the general jail population and subjected to segregated incarceration.) The federal Constitution, standing alone, does not confer upon prisoners a "liberty interest" in any particular form of confinement. *See Hewitt v. Helms,* 459 U.S. 460, 467–68, 103 S.Ct. 864, 869, 74 L.Ed.2d 675 (1983). Therefore, any liberty interest that Martucci may have had in not being segregated without benefit of a timely hearing must have derived from Tennessee statutes, rules, or regulations. *See Walker v. Mintzes,* 771 F.2d 920, 932 (6th Cir.1985) ("Any interest ... inmates have in not being placed in administrative segregation must be drawn from state law."). If this liberty interest exists as a function of state law, then the prisoner or inmate is entitled "to those minimum procedures appropriate under the circumstances and required by the Due Process clause to insure that the state-created right is not arbitrarily abrogated." *Wolff v. McDonnell,* 418 U.S. 539, 557, 94 S.Ct. 2963, 2975, 41 L.Ed.2d 935 (1974).

In support of his claim to a constitutionally cognizable liberty interest arising under state law, Martucci referred to regulations promulgated by the Tennessee Corrections Institute under the authority of T.C.A. § 41–4–140. In relevant part, these regulations govern the procedures applicable to the detention of prisoners in local jails and lock-up facilities. In the chapter styled "Discipline," there is a provision that requires the jailers to provide for "disciplinary hearings" in "cases of alleged violations of prisoner conduct rules." When a prisoner is subjected to segregated confinement in response to an alleged rule infraction, the disciplinary hearing must occur within 72 hours of his placement in isolation.

Martucci is unable to derive a liberty interest from these *regulations.* As the district court determined, and as supported by the record, Martucci was *not* subjected to "discipline" for violation of a prison rule. Rather, he was reasonably placed in segre-

---

2. *Franklin v. Rose,* 765 F.2d 82, 85 (6th Cir.1985)     (per curiam).

gated confinement for what amounted to purely administrative reasons—reasons anchored in a desire to foil his escape, thereby preserving institutional security and insuring Martucci's presence at trial.[3] Because he was not, in the germane sense of the term, subjected to "disciplinary confinement," Martucci had no right under the Tennessee Correctional Institute regulations to a "disciplinary hearing" within three days of his segregation. The regulations do not mandate hearings upon the imposition of *administrative* segregation, but refer only to disciplinary or punitive segregation. The absence of language conditioning the imposition of administrative segregation upon a due process hearing is dispositive of Martucci's procedural due process claim. *See Hewitt v. Helms,* 459 U.S. 460, 471–72, 103 S.Ct. 864, 871, 74 L.Ed.2d 675 (1983) (to create constitutionally protected liberty interest, state regulation must include "language of an unmistakably mandatory character, requiring that certain procedures 'shall,' 'will,' or 'must' be employed ... and that *administrative* segregation will not occur absent specified substantive predicates") (emphasis added); *Covino v. Vermont Dept. Corrections,* 933 F.2d 128, 130 (2nd Cir.1991) (noting that prison regulation at issue "govern[ed] punitive segregation, not administrative segregation"); *Russell v. Coughlin,* 910 F.2d 75, 77 (2nd Cir.1990).

■ Martucci's remaining constitutional claims are similarly without merit. Martucci was not denied access to the courts because the record disclosed that jail officials were in the practice of providing legal materials to inmates "upon request." The record also disclosed that Martucci was represented by appointed counsel during the entire length of his detention at the facility. "[A] prisoner's constitutionally-guaranteed right of access to the courts [is] protected when a state provides that prisoner with either the legal tools necessary to defend himself, e.g., a state-provid-

ed law library, *or the assistance of legally trained personnel."* Holt v. Pitts, 702 F.2d 639, 640 (6th Cir.1983) (per curiam) (citing *Bounds v. Smith,* 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977) (emphasis added)).

Martucci argues that although he was represented by appointed counsel during his criminal murder trial, he was nevertheless denied access to the courts insofar as the instant section 1983 cause of action was concerned, reasoning that his counsel was appointed to defend him in the criminal case and not to represent him as a plaintiff in a civil rights action. There is, however, nothing in the record to lend support to the presumption that Martucci was barred from discussing his segregated confinement—and the legal implications thereof—with his appointed attorney. The availability of counsel during Martucci's period of pre-trial confinement, coupled with the jailers' unrebutted assertion that they provided inmates with legal materials upon request, defeats Martucci's access to courts claim.

■ Finally, Martucci's claims that he was denied access to incoming mail and that he was deprived of the opportunity to send mail during the time that he was separately confined in violation of the first amendment, *see Procunier v. Martinez,* 416 U.S. 396, 408, 94 S.Ct. 1800, 1809, 40 L.Ed.2d 224 (1974), are equally misconceived. Generally, mail sent to a prisoner may be screened or censored pursuant to regulations and practices "reasonably related to penological interests." *Turner v. Safley,* 482 U.S. at 89, 107 S.Ct. at 2262. Outgoing mail, on the other hand, may be regulated according to regulations or practices that "further an important or substantial governmental interest unrelated to the suppression of expression," and that extend no further "than is necessary or essential to the protection of the particular governmental interest involved." *Procuni-*

---

**3.** Martucci argues that because he was told by one of the jailers that he would be released from segregated confinement if he "ceased causing problems," he must have been subjected to "discipline" for violation of a prison regulation.

The quoted statement from the jail official is, however, equally consistent with a finding that Martucci was *administratively* segregated in response to a report that he was scheming to escape.

*er,* 416 U.S. at 413, 94 S.Ct. at 1811. Hence, a different standard applies to the evaluation of regulations governing outgoing mail (*Procunier*) and incoming mail (*Turner v. Safley*). *See Thornburgh v. Abbot,* 490 U.S. 401, 109 S.Ct. 1874, 1881, 104 L.Ed.2d 459 (1989); *Burton v. Nault,* 902 F.2d 4, 5 (6th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 198, 112 L.Ed.2d 160 (1990).[4]

■ The jailers' decision to withhold both incoming and outgoing mail was legitimate under the dual standards enunciated in *Procunier* and *Turner v. Safley.* First, withholding mail destined for a prisoner believed to be planning an escape is "reasonably related" to the legitimate penological interest of maintaining institutional security. Second, in connection with the curtailment of outgoing correspondence, the jailers were lawfully motivated to regulate, on a content-neutral basis, Martucci's ability to correspond with individuals outside the penal institution for so long as there existed reason to believe that an escape attempt was imminent. The jailers' response to this exigency—which was to prevent Martucci from sending or receiving *any* mail—was reasonably tailored to their concerns, because any size or type of package or envelope could have contained information relating to Martucci's scheme. *See Turner v. Safley,* 482 U.S. at 91–92, 107 S.Ct. at 2263 (observing "that mail ... can be used to communicate escape plans"); *see also United States v. Stotts,* 925 F.2d 83, 87 (4th Cir.1991) (same).

Accordingly, for the reasons expressed herein, the judgment of the district court is hereby AFFIRMED.

---

**4.** The district court failed to address Martucci's mail claim, but a remand on this issue is not necessary for it may be decided on the basis of the appellate record.