**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

In Re: LONG TERM ADMINISTRATIVE
SEGREGATION OF INMATES DESIGNATED
AS FIVE PERCENTERS.

ALEXANDER MICKLE, DONNATHIAN
GRANT, AMEED STEVENSON, SHALEEK
AZEEM, ANTONIO ROACH, FOUNTAIN
WISE ALLAH, VON HUGGINS, JAMES
HUGHES, LORD MUSA GOD ALLAH,
EQUALITY KING SUPREME ALLAH,
WAYNE HEMINGWAY, KIRONDA
HAYNES, JAMES ZIMMERMAN, PRINCE
HUGHES, MILTON DOZIER, GREGORY
MOMENT, CLARENCE CARTER, RAHEEM
MALIK SHABAZZ, TEJIE WHITE,

GROVER LUMPKIN, BOOKER WILLIAMS,
WAYNE SAMUELS, CHARVELL
DOUGLAS, ELIJAH SMITH, QUINTA
PARKER, TONY ADDISON, MAURICE
JACQUES, LEROY SMALLS, EDWARD
WASHINGTON, LARRY NELSON,
DERRICK DUNBAR, RALPH DAVIS,
BRITTIE COOKE, LEROY BRICE,
JERMAINE DILLARD, LORD SHAMEAL
ALLAH, JAMES HARRINGTON, TYRONE
MITCHELL, ALBERT JONES, DAVID
CROSS, MAURICE EDWARDS, JOHN
FRAZIER,
Plaintiffs-Appellants,

v.

No. 98-7337

MICHAEL MOORE, Commissioner;
WILLIAM CATOE, Deputy Director for
Operations, South Carolina
Department of Corrections; KENNETH
D. MCKELLAR, Director of Security,
South Carolina Department of
Corrections in their official and
individual capacities,
Defendants-Appellees,

and

SCDC,
Defendant.

Appeal from the United States District Court
for the District of South Carolina, at Charleston.
Patrick Michael Duffy, District Judge.
(CA-96-5555-2-23AJ)

Argued: March 2, 1999

Decided: April 21, 1999

Before WILKINSON, Chief Judge, KING, Circuit Judge,
and LEE, United States District Judge for the
Eastern District of Virginia, sitting by designation.

_____

Affirmed by published opinion. Chief Judge Wilkinson wrote the
opinion, in which Judge King and Judge Lee joined.

_____

**COUNSEL**

**ARGUED:** Robert Earl Toone, Jr., SOUTHERN CENTER FOR
HUMAN RIGHTS, Atlanta, Georgia, for Appellants. Andrew Freder-

2

ick Lindemann, DAVIDSON, MORRISON & LINDEMANN, P.A., Columbia, South Carolina, for Appellees. **ON BRIEF:** Katharine A. Huffman, SOUTHERN CENTER FOR HUMAN RIGHTS, Atlanta, Georgia; Gregory S. Forman, Charleston, South Carolina; C. Andre Brumme, III, ACLU OF SOUTH CAROLINA, Columbia, South Carolina, for Appellants. David L. Morrison, DAVIDSON, MORRISON & LINDEMANN, P.A., Columbia, South Carolina; David C. Eckstrom, NEXSEN, PRUET, JACOBS & POLLARD, L.L.P., Columbia, South Carolina; Vinton D. Lide, LIDE, MONTGOMERY & POTTS, P.C., Columbia, South Carolina, for Appellees.

_____

**OPINION**

WILKINSON, Chief Judge:

After a series of violent prison incidents involving members of the Five Percent Nation of Islam (the Five Percenters), the South Carolina Department of Corrections (SCDC) classified the Five Percenters as a Security Threat Group (STG). Acting under its Security Threat Group policy, the SCDC then transferred all Five Percenters to administrative segregation or to maximum custody confinement. A number of those inmates filed suit, raising challenges to this policy under the Free Exercise Clause, the Equal Protection Clause, and the Eighth Amendment of the Constitution. The district court granted summary judgment to the defendant officials of the SCDC, and the inmates appeal. Because the designation of the Five Percenters as an STG was a rational response to a threat to prison safety -- a concern peculiarly within the province of penal authorities-- we affirm the judgment of the district court.

I.

This case concerns the long-term segregation under the SCDC's Security Threat Group policy of inmates affiliated with the Five Percenters, a group which appellants describe as a religious sect and which appellees claim is a violent gang. In fact, it was the history of violence involving Five Percenters that led to the group's classification as a security threat. In early 1995 three such incidents occurred

3

in SCDC facilities. That January a group of Five Percenters assaulted three other inmates at Lieber Correctional Institution, requiring the intervention of corrections personnel. In a second incident that same month, a group of Five Percenters attacked three correctional officers at the Allendale Correctional Institution, beating those officers with their own batons and assaulting them with their own pepper spray. As a result, each of the victims was hospitalized. The incident report for the Allendale attack reported that "these five inmates acted as a group," that they "felt as if they were acting in a manner acceptable to the[ir] religious beliefs," and that they "spoke of more violence to come."

The third, most serious incident occurred in April 1995, when six Five Percenters and one other inmate staged a riot in the Broad River Correctional Institution. Wielding knives, softball bats, and a variety of improvised weapons, the inmates attacked and severely injured several correctional officers in the prison cafeteria and yard. The inmates then seized one officer and two food service employees as hostages, leading to an eleven-hour standoff with law enforcement personnel. Four officers were hospitalized as a result of these events.

The SCDC's problems with the Five Percenters were neither new nor unique. In 1992 an inmate in the Central Correctional Institution reported being stabbed and beaten by a group of Five Percenters. Furthermore, according to the unit manager of the Lee Correctional Institution, a group of Five Percenters had been active in that facility as early as 1993, stealing from and preying on weaker inmates and on one occasion attempting to start a riot. In addition, SCDC Director Michael Moore learned that the Five Percenters had been active in prison systems in New Jersey, New York, North Carolina, and Virginia.

On June 16, 1995, SCDC Director of Security Kenneth McKellar sent Moore a memorandum referring generally to the Five Percenters' history of violence and describing specifically the Broad River hostage taking. In addition, the memorandum informed Moore that both the New Jersey Department of Corrections and the Federal Bureau of Prisons had classified the Five Percenters as a threat group. McKellar attached to this memo a New Jersey intelligence report describing the Five Percenters as "a group of individuals who espouse violence as

4

a means to an end." A federal intelligence summary, also obtained by the SCDC, called the Five Percenters a "radical Islamic sect/criminal group" that "is often boldly racist in its views, prolific in its criminal activities, and operates behind a facade of cultural and religious rhetoric." Based on this information and the SCDC's own experience, McKellar recommended and Moore approved the designation of the Five Percenters as an STG in South Carolina.

The SCDC's Security Threat Group policy defines an STG as

> any formal or informal organization, association, or group of three (3) or more inmates that have a common name, and whose members or associates engage or have engaged in two (2) or more activities that include planning, organizing, threatening, financing, soliciting or committing unlawful acts or acts of misconduct classified as serious threats or potential threats to the safety and security of the public, the Department, employees, visitors and/or other inmates.

SCDC Policy No. OP-21.01.[1] The SCDC Director may designate a group as an STG after consideration of, among other things, the group's history of unlawful activity in the SCDC or other prison system, its history of unlawful activity in the community, its organizational structure, and its propensity for violence. SCDC Procedure No. OP-21.01(OP). This designation permits penal institutions to remove all inmates affiliated with the STG from the general prison population, to reclassify them to a higher custody level, and hence to increase the restrictiveness of their confinement.

Classification of an individual as an STG member requires approval up the prison's chain of command, including the approval of the prison warden and the SCDC Deputy Director of Operations. An inmate who is classified as an STG member is notified of that fact and given an opportunity to respond. An inmate may be released from

_____

[1] Citations to the STG Policy and Procedure are to the versions of those instruments, dated May 15, 1996, that were presented to the district court and to this court. There has been no suggestion that these documents are not representative of the STG policy and procedure in effect in June 1995.

STG status only if the Director removes the STG designation from his group, if the SCDC finds that it has misidentified the inmate, or if the inmate renounces his affiliation with the group.

SCDC institutions proceeded to identify individual Five Percenters and to adjust their security classifications. Those inmates -- numbering approximately three hundred at the outset and approximately sixty-four as of March 1997 -- were confined in administrative segregation and in maximum custody, both of which require full-time in-cell confinement except when the inmates shower or take recreation.

In the summer of 1995 a number of those inmates filed suits in the United States District Court for the District of South Carolina. After their cases were consolidated, the appellants filed an amended complaint asserting claims under the Constitution and 42 U.S.C. § 1983. Specifically, the inmates alleged that the designation of the Five Percenters as an STG violated the Free Exercise Clause of the First Amendment and the Equal Protection Clause of the Fourteenth Amendment. They also claimed that their indefinite high-security confinement violated the Eighth Amendment.[2] Their complaint named Moore, McKellar, and William Catoe, Deputy Director for Operations of the SCDC, in their personal and official capacities, and requested injunctive relief and damages.

The Five Percenters moved for a preliminary injunction and the defendants moved for summary judgment. The district court granted the defendants' motion with regard to the free exercise, equal protection, and Eighth Amendment claims. The Five Percenters appeal.[3]

_____

[2] Appellants raised three other claims that are not at issue in this appeal. The first, a challenge to a ban on the possession of Five Percenter literature, was settled by the parties after the district court enjoined the restriction. The second, based on the Religious Freedom Restoration Act of 1993, 42 U.S.C. § 2000bb et seq., was withdrawn in light of the Supreme Court's intervening decision in City of Boerne v. Flores, 117 S. Ct. 2157 (1997). The third, based on the Due Process Clause, has been abandoned.
[3] The Five Percenters also appeal the district court's refusal to certify a class action in this case. The court reasoned that the joinder of all parties would not be impracticable, Fed. R. Civ. P. 23(a)(1), and chose instead to consolidate all Five Percenter cases pursuant to Rule 42(a). We do not think the district court abused its discretion in declining to certify a class. See Lowery v. Circuit City Stores, Inc. , 158 F.3d 742, 757 (4th Cir. 1998).

6

II.

We first address the Five Percenters' claim under the Free Exercise Clause of the First Amendment. Although the parties vigorously dispute whether the Five Percenters even constitute a religious group, the district court did not attempt to resolve this question. Rather, the court assumed -- as do we -- that the Five Percenters are a religious group entitled to First Amendment protection. We thus avoid the "difficult and delicate task" of examining the nature and sincerity of the inmates' professed beliefs. Thomas v. Review Bd. , 450 U.S. 707, 714 (1981); see Patrick v. LeFevre, 745 F.2d 153 (2d Cir. 1984).

Our review of the challenged SCDC action is nevertheless highly deferential. Even assuming that analogous action outside the prison context would violate the Constitution, "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." Turner v. Safley, 482 U.S. 78, 89 (1987); accord O'Lone v. Estate of Shabazz, 482 U.S. 342, 349 (1987); Hines v. South Carolina Dep't of Corrections, 148 F.3d 353, 358 (4th Cir. 1998). **4** This standard reflects a basic reality of conviction and confinement: Although prisoners are not completely without the Constitution's protection, "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." O'Lone, 482 U.S. at 348 (internal quotation marks omitted). For that reason,"once the Department demonstrates that it is pursuing a legitimate governmental objective, and demonstrates some minimally rational relationship between that objective and the means chosen to achieve that objective, we must approve of those means." Hines , 148 F.3d at 358.

The rationale for judicial deference is greatest when the maintenance of prison order is at stake. By using the language of rational

_____

**4** Although the parties debate the import of Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520 (1993), we think it contrary to the teachings of Turner to transpose the doctrine of non-prison cases into the prison context. Indeed, restrictions that would clearly violate the Constitution outside the prison setting may be rationally based within that setting.

7

basis scrutiny, the Supreme Court chose the most deferential possible standard of review for cases presenting such issues of prison administration. The Supreme Court also explicitly rejected heightened judicial scrutiny of prison security policies. Rigorous scrutiny, the Court noted, is simply "not appropriate for consideration of regulations that are centrally concerned with the maintenance of order and security within prisons." Thornburgh v. Abbott, 490 U.S. 401, 409-10 (1989). "Subjecting the day-to-day judgments of prison officials to an inflexible strict scrutiny analysis would seriously hamper their ability to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration." Turner, 482 U.S. at 89. In the difficult and dangerous business of running a prison, front-line officials are best positioned to foresee threats to order and to fashion responses to those threats. Hence, the "evaluation of penological objectives is committed to the considered judgment of prison administrators, `who are actually charged with and trained in the running of the particular institution under examination.'" O'Lone, 482 U.S. at 349 (quoting Bell v. Wolfish, 441 U.S. 520, 562 (1979)). When a state correctional institution is involved, the deference of a federal court is even more appropriate. Turner, 482 U.S. at 85. Prison officials "should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." Bell, 441 U.S. at 547.

The SCDC's Security Threat Group policy has exactly that objective. According to the SCDC, the purpose of the STG policy is "to promote the secure, safe, and orderly operations of all SCDC institutions, . . . to facilitate the early detection of[STG] activities and members and to ensure, to the extent possible, efficient intervention into possible volatile situations." SCDC Policy No. OP-21.01. These are not simply legitimate penological interests -- they are compelling. Hines, 148 F.3d at 358.

The Five Percenters do not -- and cannot -- claim that the STG policy itself is not rationally related to the furtherance of the legitimate end of prison security. The STG policy requires the assessment, monitoring, identification, and evaluation of all groups "whose members or associates engage or have engaged in . . . planning, organizing, threatening, financing, soliciting or committing unlawful acts or

8

acts of misconduct." SCDC Policy No. OP-21.01. And once a group has been designated as an STG, its members are identified, reclassified, and separated from the general prison population. By removing those inmates who systematically engage in violence and other unlawful acts from the general population and by increasing the security of their confinement, the STG policy targets a core threat to the safety of both prison inmates and officials. The nexus between this policy and the maintenance of prison safety is self-evident.

The Five Percenters do, however, challenge the application of the STG policy to their own group. Under Turner v. Safley, several factors "are relevant to, and serve to channel" our consideration of the rationality of the SCDC's actions. Thornburgh , 490 U.S. at 414. First, like the STG policy itself, the designation of the Five Percenters as a Security Threat Group is rationally related to the legitimate objective of penal security. There is ample evidence in the record supporting the reasonableness of Moore's conclusion that the Five Percenters as a group posed a threat to prison safety. Five Percenters had been involved in three serious acts of violence in the SCDC system in the first four months of 1995. One of those incidents involved an assault on fellow inmates, while the other two resulted in the hospitalization of prison correctional officers. Additionally, Moore presented evidence that the New Jersey Department of Corrections and the Federal Bureau of Prisons had identified the Five Percenters as a racist, violent group presenting an organized threat to prison security. In light of the information that Moore had before him, the decision to designate the Five Percenters as an STG was eminently rational.

Second, "other avenues remain available" for the Five Percenters to exercise their religious practices in administrative segregation and in maximum custody. Turner, 482 U.S. at 90 (internal quotation marks omitted). Even in high-security confinement the Five Percenters remain free to pray, fast, and study religious materials. Although the inmates are unable to participate in group meetings, they are not "deprived of all means of expression." O'Lone, 482 U.S. at 352 (internal quotation marks omitted).

Third, the accommodation of the Five Percenters' asserted rights would come at too high a cost. See Turner, 482 U.S. at 90. Prison administration often involves tough tradeoffs. In the closed environ-

9

ment of a prison, greater liberties for some may mean increased danger and intimidation for others. Because increased freedom for the Five Percenters would come "only at the cost of significantly less liberty and safety for everyone else, guards and other prisoners alike," we are particularly reluctant to interfere with the judgment of the SCDC in this case. Id. at 92-93.

Finally, there are no ready alternatives to the SCDC's course of action. See id. at 90-91. The Five Percenters urge that the SCDC should only segregate an inmate after making an individual assessment of that inmate's dangerousness. But this would simply reimpose the regime that existed before the STG classification -- a regime that Moore concluded posed an unacceptable danger to corrections officers and to other inmates. When confronted with a threat to order, "[r]esponsible prison officials must be permitted to take reasonable steps to forestall such a threat, and they must be permitted to act before the time when they can compile a dossier on the eve of a riot." Jones v. North Carolina Prisoners' Labor Union, 433 U.S. 119, 132-33 (1977); accord United States v. Stotts, 925 F.2d 83, 87 (4th Cir. 1991). Allowing prison officials to act only after a demonstration of individual dangerousness would deprive them of the all-important option of prevention. The threat of violence here was a group threat, and prison administrators were entitled to address it in those terms.

The Five Percenters offer three arguments why the SCDC's actions were unreasonable. Initially, the inmates protest that they are not a racist group and that they do not promote violence. They dispute some incidents reported by the SCDC, contend that others involved only a few inmates, and suggest that these were isolated cases. But to draw these inferences in the inmates' favor would turn Turner's command of judicial deference on its head. The question is not whether Moore's conclusion was indisputably correct, but whether his conclusion was rational and therefore entitled to deference. See Jones, 433 U.S. at 127-28. Confronted with multiple reports of an identifiable group whose members not only threatened but had actually committed serious, violent acts in the SCDC system and elsewhere, Moore's decision to designate the Five Percenters as an STG was manifestly a rational action.

Next, the Five Percenters contend that the application of the STG policy to their group is irrational because it is not "content neutral,"

10

inasmuch as it operates against the inmates on the basis of their group affiliation. But Turner's only requirement of neutrality is that the interest being furthered be "unrelated to the suppression of expression." Thornburgh, 490 U.S. at 415 (internal quotation marks omitted). Here, the STG policy is not aimed at anyone's freedom of expression. Rather, it rationally furthers the neutral policy of protecting prison security and order. It therefore does not violate the Constitution.

The Five Percenters finally question the SCDC's policy of releasing from administrative segregation those prisoners who renounce their affiliation with the group. But since the SCDC may classify inmates on the basis of their affiliation with the Five Percenters, declassifying those inmates who renounce that affiliation does not suddenly render the policy irrational. We do not think prison officials should be in the practice of prescribing -- or proscribing -- anyone's private religious beliefs. That is not their province. But it is up to the SCDC to determine when an inmate is safe to return to the general population. If the SCDC wishes to hinge that determination on the renunciation of affiliation with a violent -- albeit assertedly religious -- group, it may do so.

Although the Five Percenters would have us second-guess the SCDC in this most critical area of prison security, the Constitution does not mandate such intrusion. Because the SCDC's decision to designate the Five Percenters as an STG is rationally related to the legitimate end of prison safety and security, it does not offend the Free Exercise Clause.

III.

The Five Percenters further claim that the application of the STG policy to their group violates the Equal Protection Clause. But they offer no evidence that similarly situated groups of inmates -- religious or otherwise -- have been treated differently under the STG policy, much less that the SCDC has acted with a discriminatory purpose.[5] "There is nothing in the Constitution which requires prison

_____

[5] We therefore need not proceed to the succeeding question of whether the inmates' differential treatment, had it occurred, would have been

11

officials to treat all inmate groups alike where differentiation is necessary to avoid an imminent threat of institutional disruption or violence." Jones, 443 U.S. at 136. The inmates have simply failed to show that the SCDC violated their equal protection rights.

IV.

The Five Percenters finally contend that their long-term segregated confinement violates the Eighth Amendment. The inmates complain that they are confined to their cells for twenty-three hours per day without radio or television, that they receive only five hours of exercise per week, and that they may not participate in prison work, school, or study programs. These conditions are indeed restrictive, but the restrictive nature of high-security incarceration does not alone constitute cruel and unusual punishment. Sweet v. South Carolina Dep't of Corrections, 529 F.2d 854, 857 n.1 (4th Cir. 1975) (en banc). To make out a violation of the Eighth Amendment, the inmates "must show both (1) a serious deprivation of a basic human need; and (2) deliberate indifference to prison conditions on the part of prison officials." Strickler v. Waters, 989 F.2d 1375, 1379 (4th Cir. 1993) (internal quotation marks omitted). This inquiry has objective and subjective prongs; the Five Percenters' claim founders on both of them.

First, the Five Percenters have not shown that the conditions in administrative segregation or maximum custody work a serious deprivation of a basic human need. See Rhodes v. Chapman, 452 U.S. 337, 347 (1981). The inmates do not contend that the SCDC has failed or will fail to provide them with "adequate food, clothing, shelter, and medical care" or to protect them from harm. Farmer v. Brennan, 511 U.S. 825, 832 (1994). And the isolation inherent in administrative segregation or maximum custody is not itself constitutionally objec-

_____

rational under Turner. See Benjamin v. Coughlin, 905 F.2d 571, 575 (2d Cir. 1990); see also Salaam v. Collins, 830 F. Supp. 853, 859 (D. Md. 1993) ("Unless . . . plaintiffs can show that the challenged regulation impinges on a constitutional right -- which in an equal protection setting requires a showing of discriminatory intent -- the Turner/O'Lone [standard] is not properly invoked."), aff'd sub nom. Calhoun-El v. Robinson, 70 F.3d 1261 (4th Cir. 1995) (table).

12

tionable. Indeed, this court has noted that "isolation from companion-ship, restriction on intellectual stimulation[,] and prolonged inactivity, inescapable accompaniments of segregated confinement, will not render [that] confinement unconstitutional absent other illegitimate deprivations." Sweet, 529 F.2d at 861 (internal quotation marks omitted).

Moreover, the indefinite duration of the inmates' segregation does not render it unconstitutional. Appellants complain that they have already been confined in administrative segregation or maximum custody for over three years, and that they do not expect to be released in the foreseeable future. The duration of confinement in some of these cases has been long, but length of time is "simply one consideration among many" in the Eighth Amendment inquiry. Hutto v. Finney, 437 U.S. 678, 687 (1978); see Sweet , 529 F.2d at 861-62. Although the Five Percenters claim that their segregation has caused them to become depressed, the only evidence submitted on this point were the affidavits of a few inmates asserting that the overall conditions of their confinement have placed them under "great stress" and caused them "great emotional and physical suffering." Depression and anxiety are unfortunate concomitants of incarceration; they do not, however, typically constitute the "extreme deprivations . . . required to make out a conditions-of-confinement claim." Hudson v. McMillian, 503 U.S. 1, 8-9 (1992). A depressed mental state, without more, does not rise to the level of the "serious or significant physical or emotional injury" that must be shown to withstand summary judgment on an Eighth Amendment charge. Strickler , 989 F.2d at 1381; see Lopez v. Robinson, 914 F.2d 486, 490 (4th Cir. 1990).

Second, the SCDC has not been deliberately indifferent to the inmates' needs. See Wilson v. Seiter, 501 U.S. 294, 303 (1991); Shakka v. Smith, 71 F.3d 162, 166-67 (4th Cir. 1995). In fact, the opposite appears to be true. The SCDC's procedures for administrative segregation provide for periodic visits by medical personnel and for the referral of inmates displaying mental health problems for treatment. SCDC Procedure No. 1500.13. The Five Percenters do not allege that these procedures have not been followed-- indeed, two inmates attest that they are receiving medication for their conditions, and another states that he has refused such attention. See Taylor v. Freeman, 34 F.3d 266, 271-72 (4th Cir. 1994) (finding remedial mea-

13

sures probative of a lack of official indifference). Since the Five Percenters have failed to "come forward with evidence from which it can be inferred that the defendant-officials were . . . knowingly and unreasonably disregarding an objectively intolerable risk of harm," <u>Farmer</u>, 511 U.S. at 845-46, summary judgment on this claim was likewise proper on the basis of the defendants' state of mind.

V.

In sum, we hold that the long-term segregation of the Five Percenters is rationally based, and therefore that it does not violate the Free Exercise Clause. We further hold that the SCDC has not violated the Equal Protection Clause or the Eighth Amendment. **6** We therefore affirm the judgment of the district court.

<u>AFFIRMED</u>

_____

**6** Since we hold that there has been no constitutional violation, there is no need to address the qualified immunity of the individual defendants.

14