IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
July 17, 2012 Session

**LAWRENCE RALPH, JR. v. STATE OF TENNESSEE**

**Appeal from the Circuit Court for Warren County**
**No. F-11065      Larry B. Stanley, Jr., Judge**

**No. M2011-02067-CCA-R3-PC - Filed December 20, 2012**

The Petitioner, Lawrence Ralph, Jr., appeals as of right from the Warren County Circuit Court's denial of his petition for post-conviction relief from his drug-related convictions and effective seventeen-year sentence. The Petitioner contends (1) that he received ineffective assistance from trial counsel; and (2) that he was denied access to legal materials that he needed to prepare to represent himself at trial. Following our review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and NORMA MCGEE OGLE, J., joined.

Matthew T. Colvard, McMinnville, Tennessee (at hearing and on appeal); and David Michael DiScenza, Nashville, Tennessee (on appeal), for the appellant, Lawrence Ralph, Jr.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; Lisa Zavogiannis, District Attorney General; and Thomas J. Miner, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

FACTUAL BACKGROUND

*I. Procedural History*

The petition for post-conviction relief at issue here arises from the Petitioner's convictions, following a jury trial at which he represented himself, for initiating a process to manufacture methamphetamine, simple possession of methamphetamine, simple possession

of marijuana, and possession of drug paraphernalia. See State v. Lawrence D. Ralph, Jr., No. M2009-00729-CCA-R3-CD, 2010 WL 457496, at *1 (Tenn. Crim. App. Feb. 10, 2010), perm. app. denied, (Tenn. June 18, 2010). The Petitioner received an effective seventeen-year sentence for these convictions. This court affirmed the Petitioner's convictions and sentences on direct appeal, and our supreme court declined to review this court's opinion. On November 30, 2010, the Petitioner filed a timely, pro se petition for post-conviction relief. Counsel was appointed by the post-conviction court; however, no amended petition was filed. On June 22, 2011, the post-conviction court held a hearing on this matter and denied the Petitioner's claim for post-conviction relief. This appeal followed.

## II. Evidence at Trial

The Petitioner was arrested following the search of an apartment in McMinnville, Tennessee by deputies of the Warren County Sheriff's Department. Ralph, 2010 WL 457496, at *1. Deputies went to the apartment based upon an informant's tip that methamphetamine was being produced in the apartment and to execute an arrest warrant. Jacqueline Calaway, a resident of the apartment, answered the deputies' knock on the door. Ms. Calaway allowed the deputies to enter the apartment and consented to a search of the apartment. Upon entering the apartment, the deputies "smelled odors that [they] recognized as being produced by the manufacture of methamphetamine." Id. The deputies then arrested and searched Charles Paul Hale, another occupant of the apartment. After arresting Mr. Hale, the deputies searched the apartment's kitchen and discovered "a garbage bag full of chemicals and items used in the manufacture of methamphetamine." Id.

During the search, the deputies also noticed that the Petitioner "had iodine stains on his pants." It was explained at trial that "iodine spills were a common occurrence during the methamphetamine manufacturing process, as iodine [was] one of the three main ingredients" in its manufacture. Ralph, 2010 WL 457496, at *1 (internal quotation marks omitted). However, no scientific tests were performed to confirm the deputies' observation because the Tennessee Bureau of Investigation "did not test for iodine." Id. at *2. A search of the Petitioner revealed "a small amount of methamphetamine, the butts of a few marijuana cigarettes, and a syringe cap." Id. at *1. At trial, the Petitioner presented testimony from Ms. Calaway and several of his family members that prior to the search, he had been away from the apartment for a large portion of the day and had returned to the apartment only a short time before the deputies arrived. Id. at *3-4.

## III. Evidence at Post-Conviction Hearing

Trial counsel testified that he was an assistant public defender assigned to represent the Petitioner on this case as well as "some other cases." When he was appointed to the

Petitioner's case, trial counsel believed that he would represent the Petitioner at trial. However, the Petitioner asked the trial court to allow him to proceed pro se after the denial of a suppression motion the day before trial. The trial court granted the Petitioner's request and ordered trial counsel to serve as "elbow" counsel for the Petitioner. Trial counsel testified that he spent "[a] lot more than" eight hours preparing to represent the Petitioner in this case, including spending "one entire day going to Brushy Mountain" to meet with a witness. Trial counsel testified that he discussed trial strategy with the Petitioner, investigated the Petitioner's claim that he was not in the apartment when the methamphetamine was manufactured, and interviewed witnesses.

However, trial counsel could not recall exactly how much time he spent preparing for this case or how much time he spent "meeting with and conferring with" the Petitioner about the case. Trial counsel explained that he also represented the Petitioner in a DUI and a "marijuana case." According to trial counsel, it would "be impossible" to separate his preparation for this case from the other cases "because they were all intertwined." Trial counsel further explained that it was "not like this [was] the only case [he] had with [the Petitioner] and there [were] so many different files."

Trial counsel recalled that the Petitioner "was out on bond" after his arrest; therefore, trial counsel could not remember exactly when he first met with the Petitioner regarding this case. Trial counsel stated that while the Petitioner was released on bond, his contact with the Petitioner was sporadic. According to trial counsel, the Petitioner did come to his office "once or twice, maybe more than that" while this case was pending. However, trial counsel could not recall how much time was spent at these meetings discussing this case as opposed to the other cases the Petitioner had pending. Trial counsel testified that the Petitioner was taken "back into custody [] maybe a month [] before trial." Trial counsel recalled that he "went to see [the Petitioner] at least two or three times . . . [at the jail] over this matter."

At one meeting, trial counsel conveyed to the Petitioner a plea offer from the State. The Petitioner "got angry . . . and started pounding on the table and was upset," so trial counsel left because he "didn't want to get in an argument with him." At another meeting, the Petitioner presented trial counsel with a document entitled "Private Re-Affirmation of Oath of Office Security Agreement." The document was a private contract drafted by the Petitioner which would have required trial counsel to pay the Petitioner $1,000,000 "in silver coins" for every violation of the Petitioner's "civil rights" that the Petitioner felt occurred during the prosecution of this case. Trial counsel testified that he left the meeting without signing the document and that he was annoyed and frustrated when the Petitioner presented the document to him. Trial counsel recalled that he felt it was "a complete waste of time" to discuss the document with the Petitioner while the Petitioner had several serious felony charges pending against him.

Trial counsel testified that the document was an example of how the Petitioner had "his ideas about how things should proceed and what the law was." Trial counsel opined that the Petitioner "got some bad legal advice from some of his relatives and they believed in this freeman stuff."[1] Trial counsel testified that his relationship with the Petitioner was difficult because the Petitioner "would want to talk about these things that [he] didn't feel [had] any basis in law" and that the two "spent a lot of time disagreeing about that." Trial counsel tried not to argue with the Petitioner about his beliefs and felt that he "got along okay [with the Petitioner] otherwise." Trial counsel further testified that he harbored "no ill will towards" the Petitioner.

Trial counsel recalled that the Petitioner presented him with a list of several people he wanted to have subpoenaed to testify at trial. This list included Mr. Hale, Ms. Callaway, several of the Defendant's family members, and a woman named Holly Clayton. With the exception of Mr. Hale, the Petitioner insisted that his uncle serve the subpoenas. Trial counsel testified that he went to Brushy Mountain Correctional Complex to interview Mr. Hale. Trial counsel recalled that Mr. Hale told him that "he would like to help but [he was] afraid [that his] testimony would hurt" the Petitioner. Trial counsel testified that he had a "pleasant conversation" with Mr. Hale and that he had no reason to doubt the truthfulness of Mr. Hale's statement. Trial counsel also recalled that Mr. Hale's statement to the police was "ambiguous as to whether or not [the Petitioner] was involved" in the methamphetamine manufacture. Trial counsel testified that he did not "want to subpoena [Mr. Hale] with him telling [trial counsel that] his testimony would hurt" the Petitioner.

Trial counsel further testified that he had spoken to Ms. Callaway and was aware of what her testimony would be at trial. Trial counsel recalled that Ms. Callaway "testified consistently" with the Petitioner's trial strategy and that he thought "she was very favorable" to the Petitioner. Trial counsel could not recall if he spoke to the arresting deputy prior to trial. Trial counsel admitted that he never spoke to Ms. Clayton. Trial counsel believed that Ms. Clayton provided the tip to the police that instigated the search of the apartment. Ms. Clayton did not appear at trial to testify because the Petitioner's uncle failed to properly serve the subpoena on her. The trial court refused to grant the Petitioner a continuance to serve Ms. Clayton again. Trial counsel admitted that he took no steps to challenge the trial court's ruling or to preserve on the record what Ms. Clayton's testimony would have been had she appeared at trial.

---

[1]According to the State's brief, trial counsel's statement refers to the sovereign-citizen movement, a loose network of anti-government extremists who do not recognize federal, state, or local laws and are known for creating legal documents that contain peculiar or out-of-place language.

Trial counsel also testified that the Petitioner asked him to bring some legal materials to the jail for the Petitioner's use. Trial counsel could not recall exactly what the Petitioner asked for or if he was able to bring the Petitioner everything that the Petitioner asked for. Trial counsel believed that he took the Petitioner a copy of the Criminal Justice Handbook (Handbook) compiled by the Administrative Office of the Courts because there was "a stack of those" in his office. Trial counsel testified that the Handbook had all of the pertinent criminal statutes, but had no annotations. Trial counsel also believed that he had given the Petitioner a copy of a judicial opinion that the Petitioner had requested.

The Petitioner testified that he asked the trial court to allow him to proceed pro se because he could not get trial counsel "to do the things [he] was trying to get him to do." The Petitioner elaborated that trial counsel refused "to ask some questions [the Petitioner] wanted him to ask" of the deputies testifying at trial and that trial counsel "got plum mad" about his requests and "just absolutely refused" to ask the questions. The Petitioner did admit on cross-examination that he represented himself at trial and had the opportunity to ask the deputies whatever he wanted. The Petitioner claimed that when he presented trial counsel with the "oath of office" document, trial counsel "got mad and jumped up and [ran] out" of the meeting with him. The Petitioner also claimed that at another meeting, trial counsel brought him "a law book and [just] left." The Petitioner testified that he filed several motions while he was represented by trial counsel in order to "make sure they [were] getting filed."

According to the Petitioner, trial counsel "spent no more than probably [thirty] minutes" with him preparing for trial in this case. The Petitioner also claimed that trial counsel represented him on "like five cases" at the time, but that he had a "hard time" with trial counsel regarding this case and that he "couldn't get [trial counsel] to come out and work with [him]." The Petitioner insisted that trial counsel "just absolutely refused to do anything [he] asked him to do." According to the Petitioner, he spoke with trial counsel "numerous times" while this case was pending, "but it was always [regarding] different cases." The Petitioner admitted that he had been represented by the public defender's office "[n]umerous times" in the past and that he was "sure" that he had previous issues with their office "not pursuing theories that [he] thought they should." The Petitioner was sure of this because the Petitioner testified that he had "been in trouble with the law since [he] was [thirteen]."

The Petitioner recalled that trial counsel told him that they "probably might not ought to" subpoena Mr. Hale because Mr. Hale had stated that his testimony "would probably hurt [the Petitioner] more than [it] would do [him] any good." The Petitioner testified that he "couldn't figure out why" Mr. Hale would have said something like that. The Petitioner further testified that he wanted trial counsel to subpoena Mr. Hale and to personally serve

Mr. Hale because the Petitioner's uncle could not go to Brushy Mountain Correctional Complex to serve the subpoena. The Petitioner also complained that his constitutional rights were violated because he was not able to "face [his] accuser," the informant who had tipped off the investigating deputies, at trial.

The Petitioner testified that he had requested legal materials to prepare for his trial "[n]umerous times" and was denied access to those materials by the jail staff. The Petitioner complained that the jail director would "talk bad to [him]" in response to his requests and that he had asked every jail employee he came in contact with "if they could get [him] a law book to prepare for [his] case." The Petitioner claimed that trial counsel brought him "one law book" that only contained the criminal statutes and that he was only allowed access to the book "for one hour." The Petitioner also claimed that he was never allowed to use the "law book" again.

Mr. Hale testified that he was a co-defendant with the Petitioner in this case and that he entered into a plea agreement with the State prior to the Petitioner's trial. Mr. Hale claimed that he told the arresting deputies that "the meth lab materials" were his, but this was not recorded in his written statement. Mr. Hale recalled that trial counsel visited him while he was at the Brushy Mountain Correctional Complex. Mr. Hale testified that, at the time, he was "pretty mad at" the Petitioner because he believed that a woman the Petitioner had brought to the apartment was the informant who called the police. Mr. Hale recalled that he told trial counsel that "anything [he] had to say would hurt [the Petitioner]." Mr. Hale could not recall whether trial counsel asked him about his statements to the deputies or exactly what he knew about the case.

Mr. Hale testified that the night before the search, the Petitioner arrived at the apartment and everyone "was all partying, getting high." According to Mr. Hale, after the Petitioner left the next morning, he got the methamphetamine manufacturing materials out of his truck and brought them into the apartment. Mr. Hale claimed that the Petitioner and Ms. Callaway "never knew" about the materials. Mr. Hale testified that when he spoke to trial counsel he was so mad at the Petitioner he "wasn't going to come back [and testify on the Petitioner's behalf], period." However, Mr. Hale admitted that had he been "subpoenaed and lawfully compelled" to testify he would not have perjured himself and would have testified that the Petitioner did not know about the methamphetamine manufacturing materials at the apartment. Mr. Hale also admitted that prior to his testimony at the post-conviction hearing he had never made any statements claiming that the Petitioner was innocent.

Eddie Knowles testified that he was the Warren County Jail Director. According to Mr. Knowles, the jail did not have a law library but the jail would provide an inmate with

legal materials if the inmate was acting pro se in a case. The jail would not provide legal materials to inmates who were represented by counsel. Mr. Knowles testified that it would be counsel's responsibility to provide legal materials to inmates they represented. Mr. Knowles recalled that the Petitioner made repeated requests for legal materials while he was represented by trial counsel. Mr. Knowles testified that he told the Petitioner that "since he had a lawyer he needed to get his lawyer[] to bring him what he needed."

Following the hearing, the post-conviction court denied the Petitioner post-conviction relief.[2] The post-conviction court concluded that trial counsel's performance "fell within the range of competence demanded of attorneys in criminal cases and there was nothing regarding counsel's preparation . . . of this case . . . that had an adverse effect on the outcome of the trial." Regarding the Petitioner's claim that trial counsel was not prepared for trial and failed to adequately meet with the Petitioner, the post-conviction court accredited trial counsel's testimony and concluded that trial counsel "spent adequate time consulting with the [Petitioner] regarding his constitutional rights and his trial strategy prior to trial." Likewise, the post-conviction court concluded that trial counsel had interviewed witnesses and built a trial strategy around Ms. Calaway's testimony that the Petitioner was not present in the apartment on the morning prior to the search.

With respect to trial counsel's failure to subpoena Mr. Hale, the post-conviction court concluded that "offering proof from [Mr.] Hale would have been contrary to their trial strategy." The post-conviction court further elaborated that "if someone tells you their response is, if you call me as a witness my testimony is going to hurt your client[,] . . . it would probably be ineffective assistance to call them anyway unless you knew exactly what they were going to say." Regarding the Petitioner's claim that trial counsel failed to properly subpoena Ms. Clayton, the post-conviction court noted that "there was no proffer of what [Ms.] Clayton would or would not say at trial." The post-conviction court also concluded that "there was no need to have the jail provide [the Petitioner] legal books or resources" because trial counsel "was available to the [Petitioner] and . . . this was not that complicated of a legal issue."

## ANALYSIS

*I. Ineffective Assistance of Counsel*

---

[2]The Petitioner raised several other issues in his pro se petition. The post-conviction court ultimately denied post-conviction relief on these issues as well. However, the Petitioner has not raised these issues in this appeal.

The Petitioner contends that the post-conviction court erred by denying him post-conviction relief because he received ineffective assistance from trial counsel. The Petitioner argues that trial counsel failed "to adequately meet with him [] to discuss strategy and gain information from" the Petitioner. The Petitioner also argues that trial counsel failed to investigate Mr. Hale and call him as a witness at trial. In addition, the Petitioner argues that Mr. Hale's testimony at the post-conviction hearing constituted "new evidence requiring a new trial." The Petitioner further argues that trial counsel was ineffective for failing to interview the arresting officer and Ms. Clayton, and that trial counsel failed "to properly request a continuance" when Ms. Clayton failed to appear at trial. The State responds that the Petitioner's claims are without merit because the Petitioner represented himself at trial. The State further responds that the Petitioner failed to demonstrate that trial counsel's assistance was ineffective. The State argues that trial counsel met with the Petitioner and prepared the case for trial. The State also argues that trial counsel cannot be faulted for failing to call Mr. Hale as a witness because Mr. Hale lied to trial counsel regarding his possible testimony. The State further responds that the Petitioner has waived his claims regarding Ms. Clayton and the arresting officer because the Petitioner failed to include these claims in his petition for post-conviction relief.

The burden in a post-conviction proceeding is on the petitioner to prove his allegations of fact supporting his grounds for relief by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f); see Dellinger v. State, 279 S.W.3d 282, 293-94 (Tenn. 2009). On appeal, we are bound by the post-conviction court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. Fields v. State, 40 S.W.3d 450, 456 (Tenn. 2001). Additionally, "questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved" by the post-conviction court. Id. Because they relate to mixed questions of law and fact, we review the post-conviction court's conclusions as to whether counsel's performance was deficient and whether that deficiency was prejudicial under a de novo standard with no presumption of correctness. Id. at 457.

Under the Sixth Amendment to the United States Constitution, when a claim of ineffective assistance of counsel is made, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. Strickland v. Washington, 466 U.S. 668, 687 (1984); see Lockhart v. Fretwell, 506 U.S. 364, 368-72 (1993). In other words, a showing that counsel's performance falls below a reasonable standard is not enough; rather, the petitioner must also show that but for the substandard performance, there is a reasonable probability that "the result of the proceeding would have been different." Strickland, 466 U.S. at 694. The Strickland standard has been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. State v. Melson, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

A defendant who chooses to proceed pro se "assumes the responsibility for his inadequacies." State v. Bradfield, 973 S.W.2d 937, 945 (Tenn. Crim. App. 1997) (quoting Cole v. State, 798 S.W.2d 261, 264 (Tenn. Crim. App. 1990)). As such, "a defendant who elects to represent himself cannot thereafter complain that the quality of his own defense amounted to a denial of the 'effective assistance of counsel.'" Faretta v. California, 422 U.S. 806, 834 n.46 (1975). Likewise, this court has previously held that a defendant may not bring a claim of ineffective assistance of standby counsel[3] because the "right of a defendant to participate in his own defense is an alternative one." Bradfield, 973 S.W.2d at 945 (quoting State v. Melson, 638 S.W.2d 342, 359 (Tenn. 1982), cert. denied, 459 U.S. 1137 (1983)). A defendant cannot choose to represent himself and then expect to be afforded all of the protections guaranteed to defendants represented by counsel. A defendant "has a right either to be represented by counsel or to represent himself, to conduct his own defense." Melson, 638 S.W.2d at 359.

The State is correct in its assertion that a defendant who represents himself cannot later bring a claim for ineffective assistance of his own counsel or for standby counsel appointed to assist him. However, the issue of whether a defendant who was initially represented by counsel, but later requested to proceed pro se, may bring a subsequent claim for ineffective assistance of counsel based upon counsel's actions prior to the time the defendant elected to proceed pro se is one of first impression in this state. Other jurisdictions that have examined this issue "have permitted a criminal defendant to bring an ineffective assistance of counsel claim against advisory counsel under circumstances in which advisory counsel somehow assumed a broader role and exercised a degree of control appropriate for legal representation" including allowing a defendant to "maintain a claim for ineffective assistance of counsel for any acts or omissions that might have occurred before the defendant elected to proceed pro se." Downey v. People, 25 P.3d 1200, 1204 (Colo. 2001) (citing cases); see also Rodriguez v. State, 763 S.W.2d 893, 896 (Tex. Ct. App. 1988) (examining the record up to the point when defendant's self-representation began). These claims are limited to the "scope of the duties assigned to or assumed by counsel" and the analysis must focus on "the role of advisory counsel, not the defendant's own representation or trial strategies within his control." Downey, 25 P.3d at 1204.

Here, trial counsel was appointed to, and believed that he would, represent the Petitioner at trial. The Petitioner requested to represent himself after the denial of a suppression motion the day before trial. Therefore, we will address the Petitioner's claims of ineffective assistance of counsel regarding trial counsel's actions prior to the Petitioner's decision to represent himself. The Petitioner argues that this court should believe his claim

_____

[3]Also referred to as advisory counsel and, as commonly referred to in the courts of this state, as elbow counsel.

that trial counsel only met with him "for approximately thirty [] minutes in preparation for his trial" because it was "not refuted" at the post-conviction hearing. The appellate record clearly belies this assertion. Trial counsel testified that he could not recall how much time he spent preparing for this case because he represented the Petitioner on several other felony cases as well. However, trial counsel testified that he met with the Petitioner on several occasions both in his office and at the county jail. Trial counsel interviewed witnesses, investigated the Petitioner's claims, and developed a trial strategy that was ultimately used by the Petitioner at trial. The post-conviction court accredited trial counsel's testimony over the Petitioner's, and there is nothing in the record that preponderates against the post-conviction court's findings.

Regarding trial counsel's decision not to subpoena Mr. Hale, trial counsel testified that he went to Brushy Mountain Correctional Complex and interviewed Mr. Hale. Mr. Hale told trial counsel that his testimony "would hurt" the Petitioner. Trial counsel also testified that there was nothing in Mr. Hale's statement to the police that would have caused trial counsel to think that Mr. Hale was lying to him. Mr. Hale testified that he lied to trial counsel and said that his testimony would be harmful to the Petitioner because he was angry with the Petitioner at the time. Additionally, several members of the Petitioner's family testified at trial that the Petitioner was not at the apartment the morning before the search. Ms. Calaway likewise testified that she and the Petitioner were unaware of the methamphetamine materials in the apartment and that the Petitioner was not in the apartment that morning. We cannot fault trial counsel for not calling Mr. Hale as a witness because Mr. Hale may have lied to trial counsel about his possible testimony. There is nothing in the record to suggest that trial counsel should have been aware that Mr. Hale was lying or that trial counsel should have questioned Mr. Hale's honesty. Likewise, we will not second-guess trial counsel's strategic decision not to subpoena a witness who was openly hostile to his client.

The Petitioner also argues on appeal that Mr. Hale's testimony at the post-conviction hearing that the Petitioner was unaware of the methamphetamine materials in the apartment constituted newly discovered evidence and should result in a new trial. However, this court has previously held that claims of actual innocence not based on newly discovered scientific evidence are not cognizable in a petition for post-conviction relief. See Shaun Alexander Hodge v. State, No. E2009-02508-CCA-R3-PC, 2011 WL 3793503, at *7-8 (Tenn. Crim. App. Aug. 26, 2011), perm. app. denied, (Tenn. Feb. 15, 2012); James W. Vanover v. State, No. E2010-00203-CCA-R3-PC, 2011 WL 3655136, at *5 (Tenn. Crim. App. Aug. 19, 2011), perm. app. denied, (Tenn. Oct. 18, 2011); see also Dellinger v. State, 279 S.W.3d 282, 291 n.7 (Tenn. 2009) (holding that claims of actual innocence based upon newly discovered scientific evidence may be raised in a petition for post-conviction relief, but noting that claims of actual innocence not based on new scientific evidence should be raised in a petition

for writ of error coram nobis or in an application for executive clemency). Accordingly, this issue is without merit.

The Petitioner also raises claims that trial counsel was ineffective for failing to interview the arresting officer and Ms. Clayton. However, the Petitioner did not raise these issues in his petition for post-conviction relief. Issues raised for the first time on appeal are considered waived. Charles Orlando Fields v. State, No. W2003-02051-CCA-R3-PC, 2004 WL 1405012, at *5 (Tenn. Crim. App. June 23, 2004), perm. app. denied, (Tenn. Dec. 20, 2004). With respect to the Petitioner's claim that trial counsel failed "to properly request a continuance" when Ms. Clayton failed to appear at trial, we note that the Petitioner was representing himself at the time and that trial counsel was serving as standby counsel. The responsibility for securing a continuance rested solely with the Petitioner, and he cannot now shift the blame for his own inadequacies onto trial counsel. Accordingly, we conclude that the post-conviction court did not err in denying the Petitioner post-conviction relief based upon his claims of ineffective assistance of counsel.

## II. Access to Legal Materials

The Petitioner also contends that the post-conviction court erred by denying him post-conviction relief because he was denied access to legal materials needed to prepare his defense. The Petitioner argues that he was denied his constitutional right of access to the courts because "he had neither an attorney willing to bring him adequate legal materials or access to legal materials" through the jail. The State responds that the Petitioner was represented by counsel until the day before trial and that trial counsel brought him legal materials upon his request; therefore, the Petitioner's right to access to the courts was not violated. The State also responds that the Petitioner failed to establish that he was prejudiced by any lack of access to legal materials.

The constitutional right of access to the courts "includes the requirement that prison authorities assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." State v. Goodwin, 909 S.W.2d 35, 42 (Tenn. 1995) (quoting Bounds v. Smith, 430 U.S. 817, 828 (1977)) (internal quotation marks omitted). This requirement is met when an inmate is provided with either the "legal tools necessary for [the preparation of] a defense or the assistance of an attorney." Id. at 42 n.1 (citing Martucci v. Johnson, 944 F.2d 291, 295 (6th Cir. 1991)). Here, Mr. Knowles testified that the jail would not provide legal materials if an inmate was represented by counsel, but the jail would provide legal materials if the inmate was acting pro se. The Petitioner was represented by trial counsel until the day before trial. As such, there was no need for the jail to provide legal materials to the Petitioner because he had the assistance of an attorney. Trial counsel remained as standby counsel even

-11-

after the Petitioner decided to represent himself; therefore, the Petitioner continued to have access to trial counsel's legal knowledge and experience. Accordingly, we conclude that the post-conviction court did not err in denying the Petitioner post-conviction relief based upon this claim.

## CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgment of the post-conviction court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE

-12-