# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs April 9, 2013

## STATE OF TENNESSEE v. KENNETH L. ANDERSON

**Appeal from the Circuit Court for Dyer County**
**No. 11-CR-02      Russell Lee Moore, Jr., Judge**

**No. W2012-01039-CCA-R3-CD  - Filed October 4, 2013**

Following a jury trial, the Defendant, Kenneth L. Anderson, was convicted of one count of selling less than .5 grams of cocaine, a Class C felony. See Tenn. Code Ann. § 39-17-417 (2010). The trial court sentenced the Defendant to twelve years as a Range III, persistent offender. In this appeal as of right, the Defendant contends (1) that his right to confront one of the State's witnesses was violated; (2) that his right to present witnesses in his defense was violated; (3) that one of the State's witnesses, Penny Webber, was not competent to testify at trial; (4) that the trial court erred by denying his motion to suppress a recorded phone conversation between himself and Ms. Webber and video recordings of the drug buy; (5) that he was denied his right of access to the courts; (6) that the jury venire did not represent a fair cross-section of the community; (7) that the evidence was insufficient to sustain his conviction; (8) that he was entitled to a new trial on the basis of newly discovered evidence; and (9) that his sentence was excessive. Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and JEFFREY S. BIVINS, JJ., joined.

Kenneth L. Anderson, Tiptonville, Tennessee, pro se.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Senior Counsel; and C. Phillip Bivens, District Attorney General, for the appellee, State of Tennessee.

## OPINION

### FACTUAL BACKGROUND

In 2010, Investigator Chris Gorman of the Dyer County Sheriff's Office and Sergeant Todd Thayer of the Dyersburg Police Department were using a confidential informant, Penny Webber, to conduct undercover drug buys. According to Inv. Gorman, Ms. Webber began working for them so she could earn money in order "to get her driver's license back." Ms. Webber was paid $100 per drug buy. Inv. Gorman testified at trial that he was aware that Ms. Webber was a former cocaine user and that she had misdemeanor convictions for driving with a revoked license, shoplifting, theft, and assault. The officers did not ask Ms. Webber to target anyone specifically. Instead, the targets were "just people [Ms. Webber] knew that sold drugs, people that she had phone numbers for that she could call up and order up drugs." Sgt. Thayer testified that he and Inv. Gorman used Ms. Webber in forty or fifty drug buys.

On September 14, 2010, Ms. Webber called the Defendant to set up a drug buy. The officers recorded the phone conversation with Ms. Webber's permission, and the recording was played for the jury. Ms. Webber asked the Defendant, "a fifty, where do I go," and the Defendant told her to come to "where he live[d] at." Sgt. Thayer testified that when Ms. Webber said she wanted a "fifty," it meant that she wanted to buy fifty dollars worth of cocaine. Once the meeting was arranged, the officers searched Ms. Webber and her car to make sure she did not have any drugs or money. Sgt. Thayer testified that he "pat[ted] down" Ms. Webber, as well as checking her shoes and socks. The officers both testified that they did not find anything on Ms. Webber or in her car. However, Sgt. Thayer admitted that he did not search Ms. Webber more thoroughly than a pat down because "[w]ith a female [confidential informant], that's about as far as it goes."

Once the officers searched Ms. Webber and her car, they gave her fifty dollars of "buy money." Inv. Gorman testified that he recorded the serial numbers for the money he gave Ms. Webber. The officers placed a digital video recorder in the back seat of Ms. Webber's car and another "with Ms. Webber." The video recorders started recording right before Ms. Webber left to meet the Defendant. However, Inv. Gorman testified that the battery pack for each video recorder "[ran] out just prior to the end of the deal," so "neither recording actually captured a hand to hand transaction." The officers also placed an audio transmitter on Ms. Webber so that they could hear everything that went on in the car. The officers followed fifty to seventy-five yards behind Ms. Webber in an unmarked car. Because the officers were following so far behind Ms. Webber, they "didn't have [a] constant visual on her at all times."

Ms. Webber drove to the Defendant's house to pick him up. The Defendant asked her to take him to a local Burger King so they could meet Chris Faulcon to get the cocaine. On their way to the Burger King, the Defendant made several statements about selling drugs, including that there were certain people he would not sell to, that he did not sell small amounts of cocaine, and that he did not sell anything "but good dope." Ms. Webber asked

the Defendant if she could get an "eight ball." The Defendant told her she could get half of an "eight ball" for seventy-five dollars or three grams of cocaine for $150, but Ms. Webber insisted that she only had fifty dollars. The Defendant also told Ms. Webber that he had a nearby apartment that he sold "dope" from.

When they arrived at the Burger King, the Defendant told Ms. Webber not to be nervous. Ms. Webber gave the Defendant fifty dollars, and he got out of the car to meet with Mr. Faulcon. A short time later, the Defendant returned to the car. When Ms. Webber asked for the cocaine, the Defendant told her that Mr. Faulcon had been scared off by some police. The Defendant told Ms. Webber that they could get some cocaine at his apartment and that it would not "take two seconds to get it." Ms. Webber drove to the Defendant's apartment, and the Defendant got out of the car. At no time while he was in the car did the Defendant give Ms. Webber the fifty dollars back. Ms. Webber testified at trial that the Defendant returned to the car and gave her some cocaine. The officers testified that they heard the Defendant return to the car over the audio transmitter.

Ms. Webber then drove to meet the officers at a prearranged location. Ms. Webber gave the officers the cocaine that she had purchased. Ms. Webber and her car were searched again, and nothing was found. A lab report from the Tennessee Bureau of Investigation (TBI) showing that the substance Ms. Webber turned over to the officers was .2 grams of cocaine was introduced into evidence at trial. Inv. Gorman, Sgt. Thayer, and Ms. Webber all testified that no one else approached Ms. Webber's car during the drug buy, that Ms. Webber never exited the car, and that Ms. Webber did not purchase the cocaine from someone other than the Defendant. Ms. Webber testified that she did not secret the cocaine into the car and that she purchased it from the Defendant for fifty dollars. Inv. Gorman testified that Ms. Webber was a reliable informant and that he did not believe that she would have tried to sneak cocaine into her car.

In his case-in-chief, the Defendant recalled Ms. Webber and Sgt. Thayer to question them about exactly where he got out of Ms. Webber's car. The police report stated that the Defendant got out near a local convenience store rather than the Defendant's apartment. However, Sgt. Thayer noted that the convenience store was near the Defendant's apartment. Mr. Faulcon testified on the Defendant's behalf. Mr. Faulcon testified that he did not trust Ms. Webber. Mr. Faulcon explained that Ms. Webber was a drug user and that he had previously sold drugs to her. Mr. Faulcon testified that he did not know if he met with the Defendant on September 14, 2010, because he had "sold so much cocaine" he could not remember. At the conclusion of the trial, the jury convicted the Defendant of the charged count of selling less than .5 grams of cocaine.

At the sentencing hearing, the trial court determined that the Defendant was a Range III, persistent offender because he had six prior felony convictions. See Tenn. Code Ann. § 40-35-107(a) (defining a persistent offender as a defendant with any "combination of five (5) or more felony convictions within the conviction class or higher or within the next two (2) lower felony classes"). The trial court found that the Defendant, having been convicted of six prior felony offenses and twelve prior misdemeanor offenses, had "a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range." Tenn. Code Ann. § 40-35-114(1). The trial court also found that the Defendant committed this offense while he was released on parole. Tenn. Code Ann. § 40-35-114(13). The trial court did not find any mitigating factors that applied in this case, and sentenced the Defendant to twelve years.

## ANALYSIS

### I. Witnesses Not Present at Trial

The Defendant contends that his right to confront one of the State's witnesses was violated. The Defendant argues that he was coerced into waiving his right to confront one of the State's witnesses, TBI Agent Jacob White, when it was revealed on the day the trial was scheduled to begin that Agent White had a prior subpoena to appear in federal court and was unavailable that day. The Defendant also contends that his right to present witnesses in his defense was violated. The Defendant argues that he was coerced into waiving his right to have a witness, Milton Kirk, testify on his behalf after Mr. Kirk was mistakenly transported out of Dyer County by the Tennessee Department of Correction (TDOC). The State responds that the Defendant waived his right to confront Agent White and his right to call Mr. Kirk.

### A. TBI Agent Jacob White

The day the trial was scheduled to begin, the State informed the trial court that it had subpoenaed Agent White, but that he had "a prior subpoena" to appear in federal court the same day, and that he would be unable to appear. The Defendant moved the trial court to dismiss the indictment, complaining that his case had "been going on over a year." The Defendant admitted that he was in TDOC custody serving another sentence but that this case was preventing him "from going to [the] annex and all that." The Defendant stated that he wanted "to get it tried and over with." The trial court denied the Defendant's motion and was prepared to grant the State a continuance. At that point, the Defendant asked the trial court if the TBI lab report would "be just [as] fine as" Agent White testifying at trial.

The State responded that the Defendant would have to stipulate that the TBI lab report was authentic and admissible without Agent White's testimony. The Defendant stated that as long as the report was "just saying that the drugs [Agent White] tested [were] just drugs" and not that they belonged to the Defendant, it would "be fine" to admit the report and "just do without" Agent White. The trial court questioned the Defendant about whether he understood what he was doing by stipulating to the admissibility of the report, and the Defendant responded that he did. The Defendant stated that he wanted "to get this over with because it [had been] going on for a year." When the State introduced the TBI lab report into evidence at trial, the Defendant made no objection and stated, "that's fine."

Both the United States and the Tennessee Constitutions provide criminal defendants with the right to confront the witnesses against them, which encompasses the right to physically face and cross-examine witnesses. State v. Brown, 29 S.W.3d 427, 430-31 (Tenn. 2000). However, a defendant waives his right of confrontation with respect to a laboratory "technician" who preformed scientific tests, the results of which were recorded in a written report, "if the technician is not subpoenaed or called to the witness stand by either party." State v. Walter Thompson, No. 6, 1992 WL 99091, at *3 (Tenn. Crim. App. May 13, 1992) (citing State v. Hughes, 713 S.W.2d 58, 62 (Tenn. 1986)), perm. app. denied, (Tenn. Oct. 26, 1992); see also Brown, 29 S.W.3d at 430-31 (concluding that a defendant who "never requested that the trial court . . . allow cross-examination of the [victim] regarding her alleged prior sexual behavior" waived any confrontation clause issues).

There is no evidence that the Defendant was coerced into stipulating to the admissibility of the TBI lab report. The record demonstrates that the Defendant understood what he was doing by agreeing to the stipulation and that any desire he had to confront Agent White was outweighed by his desire to get the case "tried and over with."[1] The Defendant has made no allegations that "the test results were incorrect or that the tests were somehow mishandled," and the Defendant made no objection to the introduction of the lab report at trial. Thompson, 1992 WL 99091, at *3. Accordingly, we conclude that the Defendant knowingly and voluntarily waived his right to confront Agent White and that this issue is without merit.

*B. Milton Kirk*

The day before the trial was scheduled to begin, Mr. Kirk was transported to Dyer County to appear in an unrelated matter. The Defendant's case was continued for two days.

___

[1]To the extent that the Defendant would argue that his right to a speedy trial was somehow violated, we note that the Defendant failed to raise this issue in his brief on appeal. As such, the Defendant has waived our review of the issue. See Tenn. R. App. P. 13(b).

During that time, TDOC mistakenly transported Mr. Kirk back to a prison in the middle division of the state and was unable to transport Mr. Kirk back to Dyer County in time for the trial. The day before trial, the trial court and the State held a telephone conference with the Defendant during which they informed him that Mr. Kirk had been mistakenly transported out of Dyer County. This conference was not recorded and is not a part of the appellate record. However, this issue was exhaustively discussed prior to trial, during the trial, and at the motion for new trial hearing.

According to the record, the trial court offered to continue the Defendant's case to the following week in order to secure Mr. Kirk's appearance. The Defendant rejected the trial court's offer of a continuance and insisted on going to trial as scheduled. Prior to trial, the Defendant stated that he knew he "waived" having Mr. Kirk testify at trial. The Defendant also stated that he would have liked to have "had his testimony" but that he could "do without it." The Defendant stated that he rejected the trial court's offer of a continuance because he "didn't want nothing else to hinder" the trial because it had "been going too long." At the motion for new trial hearing, the Defendant claimed that Mr. Kirk would have testified that Ms. Webber got out of her car and went inside the apartment with the Defendant for twenty minutes before leaving to meet with the officers.

Criminal defendants are guaranteed the right to present a defense which includes the right to present witnesses favorable to their defense. Brown, 29 S.W.3d at 432. However, this right is not absolute and, in appropriate cases, "must yield to other legitimate interest in the criminal trial process." Id. (quoting Chamber v. Mississippi, 410 U.S. 284, 295 (1973)). When a defendant subpoenas a witness, but the witness fails to appear at trial, the defendant waives "[a]ny right to claim prejudice" if he fails to request a continuance "or other postponement." Reese v. State, 457 S.W.2d 877, 878 (Tenn. Crim. App. 1970); accord In re Luallen, 321 F. Supp. 1236, 1240 (E.D. Tenn. 1970). Here, the Defendant refused the trial court's offer of a continuance because he "didn't want nothing else to hinder" the trial and acknowledged on the record that he had waived Mr. Kirk's appearance at trial. Again, there is no evidence that the Defendant was coerced into his decision. Accordingly, we conclude that this issue is without merit.

*II. Penny Webber's Competency to Testify*

The Defendant contends that Ms. Webber was not competent to testify at trial and that the trial court erred by allowing her to testify. The Defendant argues that Ms. Webber was not competent to testify because she was not "a trustworthy [and] reliable citizen" due to her prior drug use and misdemeanor convictions. The State responds that Ms. Webber's prior drug use and criminal convictions affected her credibility as a witness, but not her competency to testify.

-6-

"[A]ll witnesses are presumed to be competent" to testify. State v. Samuel, 243 S.W.3d 592, 601 (Tenn. Crim. App. 2007). Tennessee Rule of Evidence 601 states that "[e]very person is presumed competent to be a witness." The Advisory Commission Comments to Rule 601 go on to state that "[v]irtually all witnesses may be permitted to testify: children, mentally incompetent persons, convicted felons." (Emphasis added). Prospective witnesses may testify so long as they have personal knowledge of the matter in question and declare to testify truthfully by oath or affirmation. Tenn. R. Evid. 602, 603.

A witness cannot be rendered incompetent to testify due solely to her bad character. 98 C.J.S. Witnesses § 104 (2013). Nor does a prior criminal conviction render a witness incompetent to testify. Grooms v. State, 450 S.W.2d 805, 807 (Tenn. Crim. App. 1969). Instead, these factors are to be considered by the trier of fact in determining a witness' credibility and weighing her testimony. Id. Here, the Defendant makes no arguments as to Ms. Webber's competency to testify aside from attacking her character. Accordingly, we conclude that this issue is devoid of merit.

### III. Suppression Motion

The Defendant contends that the trial court erred in denying his motion to suppress a recorded phone conversation between himself and Ms. Webber and video recordings of the drug buy. The Defendant argues that these recordings were obtained illegally and in violation of state wiretapping laws. The Defendant also argues that the recordings could not be "disseminated" because the officers failed to obtain a court order within forty-eight hours of making the recordings. The State responds that the officers did not need to obtain a court order because they had Ms. Webber's permission to record the phone conversation and that the provision of the wiretapping laws cited to by the Defendant was inapplicable to this case. The State further responds that the state wiretapping laws cited by the Defendant did not apply to the video recordings.

On appellate review of suppression issues, the prevailing party "is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." State v. Talley, 307 S.W.3d 723, 729 (Tenn. 2010) (quoting State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996)). Questions about "the assessment of witness credibility, the weight and value of evidence, and the resolution of evidentiary conflicts are entrusted to the trial court" as the trier of fact. State v. Meeks, 262 S.W.3d 710, 722 (Tenn. 2008). When the trial court "makes findings of fact in the course of ruling upon a motion to suppress, those findings are binding on appeal unless the evidence in the record preponderates against them." Id. A trial court's conclusions of law along with its application of the law to the facts are reviewed de novo without any presumption of correctness. Id.

*A. Phone Conversation with Ms. Webber*

Tennessee Code Annotated section 39-13-604(b)(1) provides that "[a] person commits an offense who, <u>without the consent of at least one (1) party to a communication</u>, intentionally records or disseminates a communication transmitted between (2) cellular radio telephones, a cellular radio telephone and a landline telephone, or a cordless telephone and a cellular radio telephone." (Emphasis added). It has long been held that "[s]o long as one of the participants to an electronically recorded conversation consents to the procedure, there [is] no constitutional infringement" of a defendant's right against unreasonable searches and seizures. State v. Mosher, 755 S.W.2d 464, 467 (Tenn. Crim. App. 1988); see also Tenn. Code Ann. § 39-13-601(b)(4) (stating that it is lawful "for a person acting under color of law to intercept a wire, oral or electronic communication, where . . . one of the parties to the communication has given prior consent to such interception").

The Defendant argues that section 39-13-604(f) barred the use of his recorded phone conversation with Ms. Webber because the officers failed to obtain a search warrant within forty-eight hours of making the recording. Subsection (f) states in whole:

> (1) A law enforcement officer or other person with judicial purview, while in the course of the person's employment, may record a <u>protected communication</u>, where preservation and retention of the recorded communication are pertinent to a criminal investigation; provided, that the officer follows the procedure set out in this subsection (f).
>
> (2) When an officer or other authorized person records a <u>protected communication</u>, the officer or other authorized person shall label each recording with the following information;
>
>> (A) The name of the officer or other authorized person making the recording; and
>>
>> (B) The date and time the recording is made.
>
> (3) Within forty-eight (48) hours of a law enforcement officer or other authorized person recording a <u>protected communication</u>, the officer or other authorized person shall apply to a judge authorized to issue a search warrant for an order authorizing continued recording and preservation and retention of the recordings already made. No dissemination or duplication of the recording shall be made prior to the receipt of a court order.

(4) The officer or other authorized person shall certify to the judge in a written application under oath that the recording is pertinent to a criminal investigation, the nature of the offense under investigation, and the address, if known, of the location of the cordless or cellular telephone communication intercepted.

(5) If the judge finds that the information contained in the officer's or other authorized person's written application complies with the provisions of subdivision (f)(4), the judge shall issue a court order authorizing the preservation, retention or continued recording of protected communications. The order shall include the date and time of the recording, the nature of the crime under investigation, and the address, if known, of the location of the cordless or cellular telephone intercepted. An application and order under this section shall be sealed, unless otherwise ordered by the court. Custody of the sealed application and order shall be wherever the judge directs.

(6) If no application for an order is made authorizing the preservation and retention of recorded protected communications within the forty-eight hour period, or if the officer or other authorized person does not comply with the provisions of subdivision (f)(4), the recording shall be destroyed.

(7) No recording of a protected communication, or any information contained in the recording, may be used as evidence, unless the recording was obtained in accordance with the provisions of this section; provided, that nothing in this section shall be construed to preclude the introduction of evidence derived independently from sources other than the recording.

(Emphasis added).

By its plain language, subsection (f) only applies when police officers surreptitiously intercept a "protected communication." We agree with the State's interpretation that when a party to the communication consents to its recording, the communication is no longer a "protected communication." It is well established that a search warrant is not required when police record a defendant's telephone conversations with a confidential informant, so long as the informant has consented to the recording. Mosher, 755 S.W.2d at 466-67. Here, the officers had Ms. Webber's permission to record her telephone conversation with the Defendant; therefore, subsection (f) was inapplicable to this case. Accordingly, we affirm the trial court's denial of the Defendant's motion to suppress on this ground.

*B. Video Surveillance Recordings*

The Defendant also argues that the two video recordings of the drug buy were inadmissible pursuant to section 39-13-604(f). However, as the State notes in its brief, section 39-13-604 only applies to "cordless and cellular phone transmissions." Therefore, section 39-13-604(f) would be inapplicable with respect to the video surveillance recordings. Furthermore, "a defendant does not have a privacy interest in matters voluntarily revealed to . . . a confidential informant," and video recordings "which merely show[] scenes viewable by" a confidential informant do not violate a defendant's right against unreasonable searches and seizures. United States v. Davis, 326 F.3d 361, 365-66 (2d Cir. 2003); accord United States v. Yang, 281 F.3d 534, 548 (6th Cir. 2002). Accordingly, we affirm the trial court's denial of the Defendant's motion to suppress with respect to this issue.

*IV. Access to the Courts*

The Defendant contends that he was denied his right of access to the courts. The Defendant argues that he was denied access to the prison law library and a reasonable opportunity to telephone his standby counsel because he had been placed in protective custody. The State responds that the Defendant had access to legal materials and standby counsel; therefore, he was not denied his right of access to the courts.

On numerous occasions prior to trial, the trial court informed the Defendant that it believed that his proceeding pro se was "a very bad decision" and urged the Defendant to accept appointed counsel. On November 15, 2011, the Defendant complained that he had been denied access to the prison law library because he had been placed in protective custody. The Defendant stated that he only wanted a copy of the "Tennessee courtroom book," and the trial court instructed the Defendant to "get in touch" with his standby counsel. At the motion for new trial hearing, the Defendant stated that, because he was in protective custody, the only way he could access the prison library was by "sign[ing] a paper, check[ing] [legal material] out and then bring[ing] it back." The Defendant introduced several documents showing that he had requested legal materials.

The constitutional right of access to the courts "includes the requirement that prison authorities assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." State v. Goodwin, 909 S.W.2d 35, 42 (Tenn. 1995) (quoting Bounds v. Smith, 430 U.S. 817, 828 (1977)) (internal quotation marks omitted). This requirement is met when an inmate is provided with either the "legal tools necessary for [the preparation of] a defense or the assistance of an attorney." Id. at 42 n.1 (citing Martucci v. Johnson, 944 F.2d 291, 295 (6th Cir. 1991)). "A prisoner whose access to the courts is otherwise protected is not

deprived of a constitutional right, even if his access to a law library itself is restricted." Lloyd v. Corr. Corp. Of America, 855 F. Supp. 221, 223 (W.D. Tenn. 1994). Put another way, "restricted access to the law library is not per se denial of access to the courts." Id. (quoting Walker v. Mintzes, 771 F.2d 920, 932 (6th Cir. 1985)).

We have previously held that the provision of standby counsel affords a defendant the legal tools necessary for the preparation of a defense equivalent to access to an adequate law library. Lawrence Ralph, Jr. v. State, No. M2011-02067-CCA-R3-PC, 2012 WL 6645037, at *9 (Tenn. Crim. App. Dec. 20, 2012), perm. app. denied, (Tenn. Mar. 5, 2013). Because the Defendant had access to standby counsel throughout the trial process, he was not denied his right of access to the courts regardless of his restricted access to the prison law library.

With respect to the Defendant's claim that he was not given a reasonably opportunity to telephone standby counsel while he was in protective custody, we note that a prisoner's civil rights are not violated "simply because he [can]not telephone his attorney whenever he want[s]," so long as he is provided other avenues for meaningful access to his attorney, such as mail or personal visits. Hall v. McLesky, 83 S.W.3d 752, 759 (Tenn. Ct. App. 2001). Here, the Defendant only complained about his ability to telephone standby counsel. There was no evidence that other avenues for meaningful contact with standby counsel were foreclosed to the Defendant. In fact, standby counsel was present at all of the Defendant's numerous pretrial appearances. Accordingly, we conclude that this issue is without merit.

*V. Racial Makeup of the Jury Venire*

The Defendant contends that the jury venire did not represent a fair cross-section of the community. The Defendant argues that he was denied his right to trial by a jury that represented a fair cross-section of the community because there were only three African-Americans in the jury venire. The State responds that the record contains no evidence to support the Defendant's allegations regarding this issue.

Prior to jury selection, the Defendant approached the trial court and stated that there were only two African-Americans on the jury venire. The trial court responded that there were "more than that." The trial court stated that there had been no systematic exclusion of African-Americans from the jury venire and that the reason there was a higher percentage of Caucasians than African-Americans was because African-Americans made up a smaller percentage of the population in Dyer County than Caucasians.

"[S]election of a petit jury from a representative cross-section of the community is an essential component of the Sixth Amendment right to a jury trial." State v. Bell, 745 S.W.2d 858, 860 (Tenn. 1988). In order to establish a prima facie violation of this requirement, a

defendant must show "1) that the allegedly excluded group is a distinctive group in the community; 2) that its representation on the venire is not fair and reasonable in relation to its numbers in the community; and 3) that the under representation resulted from systematic exclusion." State v. Thompson, 768 S.W.2d 239, 246 (Tenn. 1989) (citing Duren v. Mississippi, 439 U.S. 357, 364 (1979)).

Here, the Defendant has presented no evidence regarding the African-American population of Dyer County and what percentage it comprised of the total population of Dyer County. The Defendant's assertions in his appellate brief are "no substitute for a properly developed record." State v. Hugh Williams, No. 02C01-9209-CR-00220, 1994 WL 553420, at *7 (Tenn. Crim. App. Oct. 12, 1994). As such, we will not speculate as to whether the representation of African-Americans on the jury venire was fair and reasonable in relation to their numbers in the community. Furthermore, the Defendant has not made any assertion that any alleged under representation was due to the systematic exclusion of African-Americans from jury service. Accordingly, we conclude that this issue is without merit.

### VI. Sufficiency of the Evidence

The Defendant contends that the evidence was insufficient to sustain his conviction. The Defendant argues that there was insufficient proof of his guilt because the State's case was based "on the sole testimony of [an] unreliable" witness, Ms. Webber. The State responds that the evidence was sufficient to sustain the Defendant's conviction.

An appellate court's standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Bland, 958 S.W.2d at 659; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). A guilty verdict "may not be based solely upon conjecture, guess, speculation, or a mere possibility." State v. Cooper, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987). However, "[t]here is no requirement that the State's proof be

uncontroverted or perfect." State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Put another way, the State is not burdened with "an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt." Jackson, 443 U.S. at 326.

Our supreme court has held that circumstantial evidence is as probative as direct evidence. State v. Dorantes, 331 S.W.3d 370, 379-81 (Tenn. 2011). As such, "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." Id. at 381. The reason for this is because with both direct and circumstantial evidence, "a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference . . . [and] [i]f the jury is convinced beyond a reasonable doubt, we can require no more." Id. at 380 (quoting Holland v. United States, 348 U.S. 121, 140 (1954)). To that end, the duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

It is an offense for a defendant to knowingly manufacture, deliver, sell, or possess with the intent to manufacture, deliver, or sell cocaine. Tenn. Code Ann. § 39-17-417(a). It is a Class C felony to commit any of these acts when the amount of the cocaine is less than .5 grams. Tenn. Code Ann. § 39-17-417(c)(2)(A).

Here, Ms. Webber testified that she gave the Defendant fifty dollars in exchange for a small amount of cocaine. The TBI lab report established that the substance Ms. Webber surrendered to Inv. Gorman and Sgt. Thayer was cocaine and that it weighed .2 grams. As stated above, the credibility of Ms. Webber was an issue for the jury to resolve and one we cannot revisit on appeal. In addition to Ms. Webber's testimony, both Inv. Gorman and Sgt. Thayer testified that they heard the Defendant return to Ms. Webber's car after he got out at his apartment to retrieve the cocaine. An audio recording of Ms. Webber's phone call to the Defendant arranging to meet him to get a "fifty" was played for the jury. On the video surveillance recordings, the Defendant made numerous statements about selling drugs, Ms. Webber was shown giving the Defendant fifty dollars to purchase cocaine from Mr. Faulcon, and when the Defendant returned without any cocaine, he told Ms. Webber that they would have to go to his apartment to get it. Based upon the foregoing, we conclude that the evidence was sufficient to sustain the Defendant's conviction.

*VII. Newly Discovered Evidence*

The Defendant contends that he is entitled to a new trial on the basis of newly discovered evidence. The Defendant argues that after his trial he discovered that one of the video surveillance recordings ended "in a pause frame" and that a video ending "in a pause

frame" was not possible if the recorder's battery had died as the officers testified at trial. The Defendant argues that he now has an expert who will testify that the video recording was tampered with based upon the recording's ending "in a pause frame." The State responds that the Defendant had access to the video recordings well in advance of trial; therefore, any allegations that the recordings had been tampered with would not qualify as newly discovered evidence.

A new trial will be granted on the basis of newly discovered evidence only when a defendant has established the following: "(1) reasonable diligence in attempting to discover the evidence; (2) the materiality of the evidence; and (3) that the evidence would likely change the result of the trial." State v. Caldwell, 977 S.W.2d 110, 116 (Tenn. Crim. App. 1997) (citing State v. Goswick, 656 S.W.2d 355, 358-60 (Tenn. 1983)). The decision to grant or deny a new trial on the basis of newly discovered evidence "rests within the sound discretion" of the trial court. Id. at 117.

The Defendant was given access to the video recordings at a pre-trial hearing on June 28, 2011, well in advance of his December 2, 2011 trial. Therefore, the Defendant was aware that one of the recordings ended "in a pause frame" prior to his trial. During the pendency of his trial, the Defendant could have had an expert analyze the recordings to determine if there was any evidence that they had been tampered with. As such, the Defendant has failed to establish that he exercised reasonable diligence in attempting to discover the evidence. Accordingly, we conclude that the trial court did not abuse its discretion in denying the Defendant's request for a new trial on the basis of newly discovered evidence.

*VIII. Sentencing*

The Defendant contends that his sentence was excessive. The Defendant argues that the trial court improperly considered his prior felony convictions that were over ten years old in classifying him as a Range III, persistent offender and in enhancing his sentence. The State responds that the Defendant's sentence was below the midpoint of the range and that it was reasonable given the circumstances.

Appellate courts are to review "sentences imposed by the trial court within the appropriate statutory range . . . under an abuse of discretion standard with a presumption of reasonableness." State v. Bise, 380 S.W.3d 682, 709 (Tenn. 2012) (internal quotation marks omitted). A sentence will be upheld "so long as the statutory purposes and principles [of the Sentencing Reform Act] . . . have been properly addressed." Id. at 706. If this is true, this court may not disturb the sentence even if a different result were preferred. State v. Carter, 254 S.W.3d 335 (Tenn. 2008). Even if the trial court has misapplied an enhancement or

mitigating factor, the sentence will be upheld if "there are other reasons consistent with the purposes and principles of sentencing, as provided by statute . . . ." Bise, 380 S.W.3d at 706. On appeal, the burden is on the defendant to show that the sentence is improper. Tenn. Code Ann. § 40-35-401(d), Sentencing Comm'n Cmts.

The Sentencing Reform Act was enacted in order "to promote justice" by ensuring that every defendant "be punished by the imposition of a sentence justly deserved in relation to the seriousness of the offense." Tenn. Code Ann. § 40-35-102. In order to implement the purposes of the Sentencing Reform Act, trial courts must consider several sentencing principles. The sentence imposed for an offense "should be no greater than that deserved for the offense committed" and "should be the least severe measure necessary to achieve the purposes for which the sentence is imposed." Tenn. Code Ann. § 40-35-103(2), (4).

Sentences involving incarceration "should be based on the following considerations":

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

Tenn. Code Ann. §40-35-103(2). Trial courts should consider the "potential or lack of potential for the rehabilitation or treatment of the defendant" when "determining the sentence alternative or length of a term to be imposed." Tenn. Code Ann. §40-35-103(5).

In determining whether a defendant is a Range III, persistent offender, "[a]ll prior felony convictions, including those occurring prior to November 1, 1989, are [to be] included" in the trial court's analysis. Tenn. Code Ann. § 40-35-107(b)(2). This court has previously held that "[t]here appears to be no doubt that the legislature intended to permit consideration of all prior felony convictions occurring during the defendant's life" in classifying a defendant's sentencing range. State v. Wright, 836 S.W.2d 130, 136 (Tenn. Crim. App. 1992). As such, the Defendant's complaint that the trial court considered his prior convictions that were more than ten years old is without merit. There being no evidence that the trial court abused its discretion in imposing a mid-range sentence on the Defendant, we affirm the trial court's sentence of twelve years.

## CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE